**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL DYBAS, WILLIAM GRUNZE, and BENJAMIN JASON WAX, Derivatively and On Behalf of EXELON CORPORATION, | 23-CV-3318<br>Judge Valderrama<br>Magistrate Judge Valdez<br>CAT 2<br>RANDOM |
| Plaintiffs, | |
| vs. | |
| CHRISTOPHER M. CRANE, JOSEPH DOMINGUEZ, WILLIAM A. VON HOENE, JR., ANTHONY K. ANDERSON, ANN C. BERZIN, LAURIE BRLAS, YVES DE BALMANN, NICHOLAS DEBENEDICTIS, LINDA JOJO, PAUL JOSKOW, ROBERT J. LAWLESS, RICHARD W. MIES, MAYO A. SHATTUCK III, STEPHEN D. STEINOUR, JOHN F. YOUNG, and ANNE R. PRAMAGGIORE, | **F I L E D**<br><br>MAY 25 2023 SMB<br><br>THOMAS G. BRUTON<br>CLERK, U.S. DISTRICT COURT |
| Defendants, | |
| and | |
| EXELON CORPORATION, a Pennsylvania Corporation, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Michael Dybas, William Grunze, and Benjamin Jason Wax (collectively, "Plaintiffs"), by and through their respective undersigned counsel, bring this shareholder derivative action in the name and on behalf of nominal Defendant Exelon Corporation ("Exelon" or the "Company") against certain of the Company's and its subsidiaries' current and former officers and directors, in their representative capacities: Christopher M. Crane, Joseph Dominguez, William A. Von

1

Hoene, Jr., Anthony K. Anderson, Ann C. Berzin, Laurie Brlas, Yves de Balmann, Nicholas De Benedictis, Linda Jojo, Paul L. Joskow, Robert J. Lawless, Richard W. Miles, Mayo A. Shattuck III, Stephen D. Steinour, John F. Young, and Anne R. Pramaggiore (collectively, the "Individual Defendants"). Plaintiffs base their allegations on personal knowledge as to their own acts, and on information and belief as to all other allegations, based upon due investigation by respective counsel, including: (a) documents and other information obtained from the Company pursuant to pre-suit inspection demands under 15 Pa.C.S. § 1508 ("Section 1508"); (b) review and analysis of public filings made by Exelon and other persons with the United States Securities and Exchange Commission (the "SEC"); (c) review and analysis of press releases and other publications caused to be disseminated by certain of the Defendants and other persons; (d) review of news articles, shareholder communications, and postings concerning the Company's public statements; (e) review and analyses of complaints and other related materials in litigation commenced by and/or against the Company and/or its affiliates, (f) related lawsuits based on similar facts and circumstances detailed herein, including the securities class action captioned *Flynn v. Exelon Corp., et al.*, Case No. 1:19-cv-08209 (the "Securities Class Action") and the criminal actions captioned *United States v. McClain, et al.*, Case No. 1:20-cr-00812 and *United States v. Madigan ,et al.*, Case No. 1:22-cr-00155, all currently pending before this Court; and (g) review of other publicly available information concerning the Company, Individual Defendants, and other relevant persons.

## INTRODUCTION AND OVERVIEW

1.    This is a shareholder derivative action brought by Plaintiffs, shareholders of the Company, on behalf of Exelon, against the Individual Defendants and seeking to remedy their violations of federal and Pennsylvania law, and harm resulting therefrom, including damages to the Company's reputation and goodwill, when the Individual Defendants caused, approved, and/or acquiesced to the ratification of misleading statements in the Company's proxy filings and the

issuance of bribes to Michael J. Madigan ("Madigan"), the Former Speaker of the Illinois General Assembly's House of Representatives (the "Illinois House"), in exchange for the enactment of legislation favorable to the Company.

2.     Exelon is the largest electrical utility parent company in the United States, generating and distributing electricity to approximately 10 million customers throughout the Midwest and East Coast through its wholly owned and controlled subsidiaries.

3.     Exelon's largest subsidiary is Commonwealth Edison Company ("ComEd"), which delivers power to approximately 3.8 million people in Illinois comprising approximately 70% of the state's population.

4.     For nearly a decade, unbeknownst to the public, ComEd regularly and systemically issued bribes to Madigan. For example, ComEd hired a law firm that supported Madigan, selected several of Madigan's political supporters for well-compensated roles within ComEd, provided more favorable consideration to intern applicants from Madigan's ward, and even appointed one of his supporters to a director position on ComEd's Board of Directors (the "ComEd Board").

5.     In return, Madigan pledged his support of several key pieces of legislation including the 2011 Energy Infrastructure and Modernization Act ("EIMA"), the 2016 Future Energy Jobs Act ("FEJA"), and the 2019 Clean Energy Progress Act ("CEPA").

6.     Passing the Illinois General Assembly over the veto of then-Governor Pat Quinn ("Quinn"), EIMA allowed ComEd to invest up to $3 billion into Illinois's electrical grid and recoup its expenditures by raising consumer rates. Originally, pursuant to the text of EIMA, ComEd could only recoup costs "prudently incurred" and "reasonable in amount" according to the decisions and advisory opinions rendered by the Illinois Commerce Commission (the "ICC").

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| MICHAEL DYBAS, WILLIAM GRUNZE, and BENJAMIN JASON WAX, Derivatively and On Behalf of EXELON CORPORATION,<br><br>Plaintiffs,<br><br>vs.<br><br>CHRISTOPHER M. CRANE, JOSEPH DOMINGUEZ, WILLIAM A. VON HOENE, JR., ANTHONY K. ANDERSON, ANN C. BERZIN, LAURIE BRLAS, YVES DE BALMANN, NICHOLAS DEBENEDICTIS, LINDA JOJO, PAUL JOSKOW, ROBERT J. LAWLESS, RICHARD W. MIES, MAYO A. SHATTUCK III, STEPHEN D. STEINOUR, JOHN F. YOUNG, and ANNE R. PRAMAGGIORE,<br><br>Defendants,<br><br>and<br><br>EXELON CORPORATION, a Pennsylvania Corporation,<br><br>Nominal Defendant. | Case No. |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Michael Dybas, William Grunze, and Benjamin Jason Wax (collectively, "Plaintiffs"), by and through their respective undersigned counsel, bring this shareholder derivative action in the name and on behalf of nominal Defendant Exelon Corporation ("Exelon" or the "Company") against certain of the Company's and its subsidiaries' current and former officers and directors, in their representative capacities: Christopher M. Crane, Joseph Dominguez, William A. Von

Hoene, Jr., Anthony K. Anderson, Ann C. Berzin, Laurie Brlas, Yves de Balmann, Nicholas De Benedictis, Linda Jojo, Paul L. Joskow, Robert J. Lawless, Richard W. Miles, Mayo A. Shattuck III, Stephen D. Steinour, John F. Young, and Anne R. Pramaggiore (collectively, the "Individual Defendants"). Plaintiffs base their allegations on personal knowledge as to their own acts, and on information and belief as to all other allegations, based upon due investigation by respective counsel, including: (a) documents and other information obtained from the Company pursuant to pre-suit inspection demands under 15 Pa.C.S. § 1508 ("Section 1508"); (b) review and analysis of public filings made by Exelon and other persons with the United States Securities and Exchange Commission (the "SEC"); (c) review and analysis of press releases and other publications caused to be disseminated by certain of the Defendants and other persons; (d) review of news articles, shareholder communications, and postings concerning the Company's public statements; (e) review and analyses of complaints and other related materials in litigation commenced by and/or against the Company and/or its affiliates, (f) related lawsuits based on similar facts and circumstances detailed herein, including the securities class action captioned *Flynn v. Exelon Corp., et al.*, Case No. 1:19-cv-08209 (the "Securities Class Action") and the criminal actions captioned *United States v. McClain, et al.*, Case No. 1:20-cr-00812 and *United States v. Madigan ,et al.*, Case No. 1:22-cr-00155, all currently pending before this Court; and (g) review of other publicly available information concerning the Company, Individual Defendants, and other relevant persons.

## **INTRODUCTION AND OVERVIEW**

1.      This is a shareholder derivative action brought by Plaintiffs, shareholders of the Company, on behalf of Exelon, against the Individual Defendants and seeking to remedy their violations of federal and Pennsylvania law, and harm resulting therefrom, including damages to the Company's reputation and goodwill, when the Individual Defendants caused, approved, and/or acquiesced to the ratification of misleading statements in the Company's proxy filings and the

2

issuance of bribes to Michael J. Madigan ("Madigan"), the Former Speaker of the Illinois General Assembly's House of Representatives (the "Illinois House"), in exchange for the enactment of legislation favorable to the Company.

2.      Exelon is the largest electrical utility parent company in the United States, generating and distributing electricity to approximately 10 million customers throughout the Midwest and East Coast through its wholly owned and controlled subsidiaries.

3.      Exelon's largest subsidiary is Commonwealth Edison Company ("ComEd"), which delivers power to approximately 3.8 million people in Illinois comprising approximately 70% of the state's population.

4.      For nearly a decade, unbeknownst to the public, ComEd regularly and systemically issued bribes to Madigan. For example, ComEd hired a law firm that supported Madigan, selected several of Madigan's political supporters for well-compensated roles within ComEd, provided more favorable consideration to intern applicants from Madigan's ward, and even appointed one of his supporters to a director position on ComEd's Board of Directors (the "ComEd Board").

5.      In return, Madigan pledged his support of several key pieces of legislation including the 2011 Energy Infrastructure and Modernization Act ("EIMA"), the 2016 Future Energy Jobs Act ("FEJA"), and the 2019 Clean Energy Progress Act ("CEPA").

6.      Passing the Illinois General Assembly over the veto of then-Governor Pat Quinn ("Quinn"), EIMA allowed ComEd to invest up to $3 billion into Illinois's electrical grid and recoup its expenditures by raising consumer rates. Originally, pursuant to the text of EIMA, ComEd could only recoup costs "prudently incurred" and "reasonable in amount" according to the decisions and advisory opinions rendered by the Illinois Commerce Commission (the "ICC").

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL DYBAS, WILLIAM GRUNZE, and BENJAMIN JASON WAX, Derivatively and On Behalf of EXELON CORPORATION, | Case No. |
| Plaintiffs, | |
| vs. | |
| CHRISTOPHER M. CRANE, JOSEPH DOMINGUEZ, WILLIAM A. VON HOENE, JR., ANTHONY K. ANDERSON, ANN C. BERZIN, LAURIE BRLAS, YVES DE BALMANN, NICHOLAS DEBENEDICTIS, LINDA JOJO, PAUL JOSKOW, ROBERT J. LAWLESS, RICHARD W. MIES, MAYO A. SHATTUCK III, STEPHEN D. STEINOUR, JOHN F. YOUNG, and ANNE R. PRAMAGGIORE, | |
| Defendants, | |
| and | |
| EXELON CORPORATION, a Pennsylvania Corporation, | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs Michael Dybas, William Grunze, and Benjamin Jason Wax (collectively, "Plaintiffs"), by and through their respective undersigned counsel, bring this shareholder derivative action in the name and on behalf of nominal Defendant Exelon Corporation ("Exelon" or the "Company") against certain of the Company's and its subsidiaries' current and former officers and directors, in their representative capacities: Christopher M. Crane, Joseph Dominguez, William A. Von

Hoene, Jr., Anthony K. Anderson, Ann C. Berzin, Laurie Brlas, Yves de Balmann, Nicholas De

Benedictis, Linda Jojo, Paul L. Joskow, Robert J. Lawless, Richard W. Miles, Mayo A. Shattuck III,

Stephen D. Steinour, John F. Young, and Anne R. Pramaggiore (collectively, the "Individual

Defendants"). Plaintiffs base their allegations on personal knowledge as to their own acts, and on

information and belief as to all other allegations, based upon due investigation by respective counsel,

including: (a) documents and other information obtained from the Company pursuant to pre-suit

inspection demands under 15 Pa.C.S. § 1508 ("Section 1508"); (b) review and analysis of public filings

made by Exelon and other persons with the United States Securities and Exchange Commission (the

"SEC"); (c) review and analysis of press releases and other publications caused to be disseminated by

certain of the Defendants and other persons; (d) review of news articles, shareholder communications,

and postings concerning the Company's public statements; (e) review and analyses of complaints and

other related materials in litigation commenced by and/or against the Company and/or its affiliates,

(f) related lawsuits based on similar facts and circumstances detailed herein, including the securities

class action captioned *Flynn v. Exelon Corp., et al.*, Case No. 1:19-cv-08209 (the "Securities Class

Action") and the criminal actions captioned *United States v. McClain, et al.*, Case No. 1:20-cr-00812

and *United States v. Madigan ,et al.*, Case No. 1:22-cr-00155, all currently pending before this Court;

and (g) review of other publicly available information concerning the Company, Individual

Defendants, and other relevant persons.

## INTRODUCTION AND OVERVIEW

1.      This is a shareholder derivative action brought by Plaintiffs, shareholders of the

Company, on behalf of Exelon, against the Individual Defendants and seeking to remedy their

violations of federal and Pennsylvania law, and harm resulting therefrom, including damages to

the Company's reputation and goodwill, when the Individual Defendants caused, approved, and/or

acquiesced to the ratification of misleading statements in the Company's proxy filings and the

issuance of bribes to Michael J. Madigan ("Madigan"), the Former Speaker of the Illinois General Assembly's House of Representatives (the "Illinois House"); in exchange for the enactment of legislation favorable to the Company.

2.     Exelon is the largest electrical utility parent company in the United States, generating and distributing electricity to approximately 10 million customers throughout the Midwest and East Coast through its wholly owned and controlled subsidiaries.

3.     Exelon's largest subsidiary is Commonwealth Edison Company ("ComEd"), which delivers power to approximately 3.8 million people in Illinois comprising approximately 70% of the state's population.

4.     For nearly a decade, unbeknownst to the public, ComEd regularly and systemically issued bribes to Madigan. For example, ComEd hired a law firm that supported Madigan, selected several of Madigan's political supporters for well-compensated roles within ComEd, provided more favorable consideration to intern applicants from Madigan's ward, and even appointed one of his supporters to a director position on ComEd's Board of Directors (the "ComEd Board").

5.     In return, Madigan pledged his support of several key pieces of legislation including the 2011 Energy Infrastructure and Modernization Act ("EIMA"), the 2016 Future Energy Jobs Act ("FEJA"), and the 2019 Clean Energy Progress Act ("CEPA").

6.     Passing the Illinois General Assembly over the veto of then-Governor Pat Quinn ("Quinn"), EIMA allowed ComEd to invest up to $3 billion into Illinois's electrical grid and recoup its expenditures by raising consumer rates. Originally, pursuant to the text of EIMA, ComEd could only recoup costs "prudently incurred" and "reasonable in amount" according to the decisions and advisory opinions rendered by the Illinois Commerce Commission (the "ICC").

7.     With the passage of FEJA in 2016, however, the Illinois General Assembly effectively defanged the ICC's ability to exercise oversight over ComEd's rate changes, thereby guaranteeing its continued profits at the expense of consumers.

8.     Finally, with the introduction of CEPA in 2019, Exelon looked forward to additional hundreds of millions in profits. Namely, if passed, CEPA would require ComEd to purchase energy from three financially distressed and underutilized nuclear power plants operated by Exelon's subsidiary, Exelon Generation. CEPA, like EIMA before it, additionally allowed Exelon to pass the increased costs of power generation at the nuclear plants on to the rate-paying public. CEPA was signed by the Governor of Illinois into law in August 2021.

9.     EIMA, FEJA, and CEPA were not the only legislative benefits Exelon received in Illinois. For example, following the passage of EIMA, the ICC interpreted it in a manner adverse to ComEd. With the passage of 2013 Senate Bill 9, however, the Illinois General Assembly effectively overruled the ICC's decision, thus allowing ComEd to substantially increase rates throughout the state. Moreover, on February 5, 2019, House Bill 3152 was introduced to provide for the extension of ComEd's increased rates through 2032.

10.     This bribery scheme was revealed to the public on July 16, 2020, when the United States Attorney for the Northern District of Illinois ("USAO"), announced a deferred prosecution agreement ("DPA") wherein Exelon, on behalf of ComEd, agreed to pay a $200 million criminal penalty and implement a set of corporate governance reforms.

11.     On September 29, 2020, former ComEd Senior Vice President of Governmental and External Affairs Fidel Marquez ("Marquez") pled guilty to a corruption charge.

12.     On November 18, 2020, former ComEd Chief Executive Officer ("CEO") Defendant Anne R. Pramaggiore ("Pramaggiore"), former ComEd Executive Vice President of

4

Governmental and External Affairs John Hooker ("Hooker"), ComEd lobbyist Michael F. McClain ("McClain"), and ComEd consultant and subcontractor Jay Doherty ("Doherty") (collectively, the "ComEd Four") were indicted for various counts of bribery and conspiracy.

13.     On March 3, 2022, Madigan and McClain were indicted on federal racketeering charges. They are set for trial in April 2024.

14.     On May 2, 2023, the ComEd Four were found guilty of conspiracy, bribery, public corruption, and falsification of books and records.

15.     As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Exelon has sustained damages as described below.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question by arising pursuant to § 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), including Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder.

17.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), which arise out of the same transactions and occurrences as Plaintiffs' federal claims.

18.     This derivative action is not a collusive action to confer jurisdiction on this Court it would not otherwise have.

19.     This Court has personal jurisdiction over each Defendant because they are either a corporation that conducts business in and maintains operations in this District, or he or she is an individual who is either present in his District for jurisdictional purposes or has sufficient minimum contacts with this District to render the exercise of this Court's jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District pursuant 28 U.S.C. § 1391 because the Company maintains a principal place of business or executive offices in this District, a substantial portion of the wrongs complained of herein occurred in this District, and the Defendants engaged in numerous activities which had an effect on this District.

**PARTIES**

**A.     PLAINTIFFS**

21.     Plaintiff Michael Dybas ("Dybas") has been a shareholder of Exelon common stock since at least 2014 and has continually held Exelon common stock since that date through the present.

22.     Plaintiff William Grunze ("Grunze") has been a shareholder of Exelon common stock since July 8, 2011, and has continuously held Exelon common stock since that date through the present.

23.     Plaintiff Benjamin Jason Wax ("Wax") has been a shareholder of record of Exelon common stock since at least 2002 and has continuously held Exelon common stock since that date through the present.

**B.     NOMINAL DEFENDANT EXELON AND ITS SUBSIDIARIES**

24.     Nominal Defendant Exelon Corporation is a Pennsylvania corporation with principle executive offices in Chicago, Illinois. Exelon's common stock trades on the NASDAQ stock exchange under the ticker symbol "EXC"; it is part of both the S&P 100 and 500 Indexes. Prior to September 25, 2019, Exelon common stock traded on the New York Stock Exchange ("NYSE") under the same ticker symbol.

25.     Exelon itself serves as a holding company with two sets of subsidiaries: (i) "Exelon Generation," which generates power and was recently renamed "Constellation Energy Corporation"; and (ii) "Exelon Utilities," a collection of six highly regulated utility companies that

6

deliver, but do not generate, electricity in discrete geographic areas. Of particular note, Exelon Generation operates six nuclear power plants in Illinois and is dependent on Illinois and federal legislative and regulatory outcomes, which greatly impact the profitability of its highly regulated plants.

26.     ComEd is the largest subsidiary under the Exelon Utilities umbrella and shares a headquarters with Exelon in Chicago, Illinois. ComEd is responsible for delivering electricity to more than 4 million customers, or the majority of the population of Illinois. Although ComEd does not issue publicly traded stock, it does issue debt securities to the investing public, requiring it to periodically make certain public disclosures through filings with the SEC.

27.     The entities named in ¶¶ 24-27 (Exelon, Exelon Generation/Constellation Energy Corp., Exelon Utilities, and ComEd) are referred to collectively herein as the "Company."

C.     **THE INDIVIDUAL DEFENDANTS**

28.     Defendant Christopher M. Crane ("Crane") was Exelon's CEO and the Chair of its Board of Directors ("Exelon Board") from March 2012 to December 2022. Crane also was President of Exelon from 2008 to December 2022. From 2020 to 2022, Crane served as a member of the Risk Committee on Exelon's Board. In his various roles, Crane collected total annual compensation of approximately $5.5 to $15.6 million.

29.     Defendant Joseph Dominguez ("Dominguez") was the CEO of ComEd from August 2018 to early 2021. Prior thereto, Dominguez served as Exelon's Executive or Senior Vice President of Governmental Affairs from 2010 to August 2018. In his various roles, Dominguez collected total annual compensation of approximately $2.2 to $3.2 million.

30.     Defendant William A. Von Hoene, Jr. ("Von Hoene") was Exelon's Senior Vice President and Chief Strategy Officer from March 2012 to March 2021. Prior thereto, Von Hoene

7

was an Executive Vice President at Exelon from 2008 to March 2012. In his various roles, Von Hoene collected total annual compensation of approximately $2.9 to $6.2 million.

31.     Defendant Anthony K. Anderson ("Anderson") has been an Exelon Board member since January 2013. Anderson serves as Chair of the Audit Committee and is a member of the Corporate Governance Committee and the Risk Committee.

32.     Defendant Ann C. Berzin ("Berzin") was an Exelon Board member from 2012 to 2023 and former Chair of the Audit and Risk Committee before the Exelon Board split that committee into separate Audit and Risk Committees. Berzin served as Chair of the Risk Committee and a member of the Audit Committee thereafter.

33.     Defendant Laurie Brlas ("Brlas") was an Exelon Board member from 2018 to 2022. Brlas was a member of the Compensation Committee and the Risk Committees.

34.     Defendant Yves C. de Balmann ("de Balmann") was an Exelon Board member from 2012 to 2022. De Balmann was the Chair of the Compensation Committee and a member of the Corporate Governance and Risk Committees.

35.     Defendant Nicholas DeBenedictis ("DeBenedictis") was an Exelon Board member from 2002 to 2021. DeBenedictis also served as a member of the ComEd Board.

36.     Defendant Linda Jojo ("Jojo") has been an Exelon Board member since September 2015. Jojo is a member of the Compensation Committee and the Risk Committee.

37.     Defendant Paul L. Joskow ("Joskow") was an Exelon Board member from 2007 to 2023. Joskow was a member of the Audit Committee and the Risk Committee.

38.     Defendant Robert J. Lawless ("Lawless") was an Exelon Board member from 2012 to 2022. Lawless was the Chair of the Corporate Governance Committee and a member of the Compensation Committee and the Risk Committee.

8

39.     Defendant Richard W. Mies ("Mies") was an Exelon Board member from 2009 to 2020.

40.     Defendant Mayo A. Shattuck III ("Shattuck") was an Exelon Board member from 2012 to 2022, and is a former Chair of the Exelon Board, former Chair of the Oversight Committee, and a former member of the Risk Committee.

41.     Defendant Stephen D. Steinour ("Steinour") was an Exelon Board member from 2007 to 2020.

42.     Defendant John F. Young ("Young") has been the Chair of the Exelon Board since 2022 and an Exelon Board member since July 2018. Young is a member of the Compensation, Oversight, and Risk Committees.

43.     Defendant Pramaggiore was the CEO of ComEd from 2011 to 2018 and the CEO of Exelon Utilities and a Senior Executive Vice President of Exelon from 2018 to October 2019, when she resigned during the USAO's investigation of the bribery scheme. Pramaggiore was also Vice Chair of ComEd's Board from 2012 to the date of her resignation. Prior to becoming CEO of ComEd, Pramaggiore was its Chief Operating Officer ("COO"). In her roles, Pramaggiore collected approximately $4-6 million of annual total compensation. Pramaggiore was indicted for one count of conspiracy, four counts of public corruption, and four counts of falsification of books and records by a federal grand jury on November 18, 2020. A jury found her guilty of all charges on May 2, 2023.

## GENERAL FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

44.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of loyalty, good faith, due care, oversight, reasonable inquiry, supervision, fair dealing, and candor and were and

9

are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owed and owes the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

45.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or conspired with and/or aided and abetted other Defendants who committed the wrongful acts complained of herein.

46.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so the market price of the Company's stock will be based on truthful and accurate information.

47.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

      A.     Ensure the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

      B.     Conduct the affairs of the Company in a lawful, efficient, business-like

manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

C.    Properly and accurately guide stockholders and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, the risks the Company faced, and ensuring the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

D.    Remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

E.    Ensure the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

48.    Each Individual Defendant, as an executive officer and/or director, or otherwise acting in concert therewith, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders.

**DUTIES IMPOSED ON THE INDIVIDUAL DEFENDANTS BY THE COMPANY'S GOVERNING DOCUMENTS**

49.    Exelon has maintained a Code of Business Conduct (the "Code") since at least 2012

11

that prohibits conducting lobbying activities that are prohibited by law or may otherwise disobey the "spirit" of the law. In particular, in a section entitled "Lobbying," the Code states:

> Exelon is subject to regulation at various levels of government and is profoundly affected by decisions of elected and appointed government officials. Exelon is therefore engaged with and actively lobbies such government officials in the policymaking process in support of Exelon's business interests on various issues. It is important to our success that advocacy on behalf of Exelon be consistent, coordinated and focused on both our short-term and long-term interests. No Exelon personnel may engage in lobbying activities on behalf of the Company, testify or provide comments before any legislative committees for Exelon, or accept an appointment to an advisory or study group established by a legislative body or administrative agency on behalf of Exelon without first obtaining the approval of Government and Regulatory Affairs or the Legal Department. Government and Regulatory Affairs will also help ensure compliance with all lobbying registration, reporting, and disclosure requirements. ***All Exelon lobbyists are expected to follow both the letter and spirit of the lobbying laws and to maintain the highest standards of professional integrity.***[1]

> \*     \*     \*

> Exelon ... advocates for legislation we believe will enhance value for our customers, communities, employees and shareholders. Those of us who have contact with legislators, regulators, executive branch officials or their staffs may be involved in lobbying and must take care to comply with the laws applicable to these activities.

50.     In a section entitled "Creating, Maintaining and Disclosing Accurate Books and Records," the Code also requires all Exelon employees and agents to:

- Follow generally accepted accounting principles and all record-keeping procedures and guidelines in our internal controls systems
- Never keep off-the-book accounts or false or incomplete records
- ***Never make an entry in any record that intentionally misrepresents, conceals or disguises the true nature of any transaction, event or condition***
- Record all business transactions, events and conditions accurately, completely and in a timely fashion
- Ensure that there is clear, complete, fair and accurate reporting and supporting records of financial information pertaining to business transactions
- Follow all delegation of authority and segregation of duties requirements established by the company involving the authorization, creation, approval and

---

[1]     Unless noted otherwise, all emphasis is added.

reconciliation of transactions

- Provide actual receipts or back-up documentation when required
- Never mislead or misinform anyone about our business operations or finances
- Immediately report any requests received to manipulate accounts, books and records, or financial reports, and any suspected misconduct regarding accounting, internal controls, or auditing matters to the Ethics and Compliance Office, Audit and Controls, or the Legal Department
- Report accounting or internal control deficiencies that have the potential to adversely affect the ability of Exelon to record, process or report financial or operations data.

51.     The Code also has a large section titled "Fighting Bribery and Corruption" which states:

Our business relationships are based on trust, transparency and accountability. We win business with integrity and through the superior value we provide. *We never request, offer or accept any form of payment or incentive intended to improperly influence a decision.*

\*          \*          \*

*Bribes or kickbacks of any kind, whether involving commercial partners or government agents or officials, are unethical and violate our core values and the Code. They are also illegal.*

In our day-to-day job responsibilities, we may come into contact with government officials. For example, securing construction permits, passing safety inspections or responding to regulatory requests all require working with government officials.

As a U.S.-based company, we comply with the U.S. Foreign Corrupt Practices Act (FCPA). We also live up to the anticorruption laws of any other country where the company pursues business opportunities.

\*          \*          \*

What's Expected:

- Never provide anything of value to a government official without the prior approval of Government and Regulatory Affairs or the Legal Department.
- Keep accurate and complete records so all payments are honestly detailed and company funds are not used for unlawful purposes.
- Conduct due diligence on all potential agents, consultants or other business partners
- *Never use a third party to make payments or offers that could be improper.*

13

*    *    *

A BRIBE occurs when someone gives or promises another person something of value to obtain an undue business advantage. Examples of bribery include:

- A customer giving cash or anything else of value to a company employee to get the employee to fulfill the customer's order ahead of other customers
- Making a requested donation to the charity of choice of a public official from whom we are awaiting a signed contract for new business
- Paying a "success fee" to a third party based on access to government official
- ***Providing something of value for the benefit of a public official in a position to make a decision that could benefit the company.***
- Paying for a side trip or other entertainment for a visiting foreign official unrelated to a site visit or meeting.

*    *    *

***Bribes and kickbacks of any kind are unethical, illegal and violate our core values and the Code.***

52.    The Code explains the consequences for agents, executives, and employees for not following the Code in a section titled "Disciplinary Action," which states:

The Code is of the utmost importance to the company and violations will not be tolerated. ***Accordingly, the Code will be appropriately enforced, regardless of the seniority, role or location of those involved in misconduct.***

Disciplinary action may be taken against any Exelon employee who:

- ***Authorizes or participates in actions that violate the Code or the law***
- ***Fails to report or delays the reporting of a Code violation***
- Fails to cooperate with an investigation, conceals information or otherwise intentionally obstructs an investigation concerning a suspected violation of the Code or law
- Retaliates or discriminates in any way against anyone who, in good faith, reports a suspected Code or legal violation or cooperates in an investigation of a suspected violation
- Fails to complete or falsely completes a certification of compliance or related questionnaire

*    *    *

A waiver of any provision of the Code will be made only in exceptional circumstances for substantial cause. Requests for waivers must be submitted to the

14

corporate general counsel, or his or her designee, for review and resolution. Any request for a waiver by any director or executive officer must be submitted to the board of directors or a board committee. All waivers will be reported to the Exelon Ethics and Compliance Steering Committee. In any addition, any waiver of a provision in the Code for any director or executive officer will be disclosed to shareholders.

53.     The Code is explicitly noted and attached as an exhibit to the Company's public filings with the SEC, including its 2018 Annual 10-K Report (the "FY2018 Report") filed with the SEC on February 8, 2019. Further, those filings stated that the Code was approved by the Exelon Board.

54.     The Code states that it is applicable to all "Exelon directors, officers and employees" and third parties "such as consultants, agents, sales representatives, distributors, vendors, suppliers, and independent contractors." Moreover, the Code is also applicable to "Exelon subsidiaries" such as ComEd.

55.     In addition to the Code and other policies, Exelon Board members are bound by the "Corporate Governance Principles" (the "Principles"). The Principles are explicitly noted in the Company's public filings with the SEC, including its FY2018 Report, and stockholders are directed to review the Principles therein.

56.     Pursuant to the Principles, the Exelon Board is "primarily responsible for overseeing the Company." The Exelon Board's responsibilities include, but are not limited to:

[O]versight of the Company's development and execution of strategy and long-range business plan; business operations and performance, including safety and reliability; capital structure and capital allocation, including financing and investments; enterprise risks, including commodity markets, market design, enterprise security (physical and cyber), operating risks, and financial performance; executive compensation; corporate citizenship, including sustainability and environmental stewardship, reputation, social responsibility, and ethical business practices; and governance practices. The Board and its Committees select and oversee senior management, which is responsible for managing the business of the Company under the direction of the Board.

57.     The Principles also specify that the Exelon Board selects the Company's CEO based on factors that include, among other things:

> [V]isionary and strategic intellectual abilities, business and operational experience, experience and effectiveness in executing corporate strategy and priorities, and demonstrated ability to meet stakeholder needs. The CEO should demonstrate the Company's values including a dedication to safety, operational excellence and continuous improvement, integrity and accountability to communities and the environment, and a commitment to fostering an inclusive and diverse culture. In addition to the responsibilities set forth in the Company's bylaws and responsibilities delegated by the Board to the CEO from time to time, the CEO is responsible for developing the strategic plan, public policy positions, a strong and diverse executive management team, financial and operational results, and representing the Company to the public and to its investors.

58.     Further, the Principles delegate responsibility for conducting "annual evaluations of the performance of the Board, Board Committees, and individual directors" to the Corporate Governance Committee. The annual evaluation "involves consideration and discussion of the performance of the Board as a group, the performance of Board Committees, and the contributions and performance of each individual director." Further, the Corporate Governance Committee also "coordinates the Board's establishment of performance criteria and the process used to assess the performance of the Board Chair (if employed by the Company) and the CEO."

59.     In addition, the Company's Risk Committee—which was chaired by Defendant Berzin prior to her resignation—is specifically tasked with assisting the Exelon Board and the boards of all of Exelon's subsidiaries, including ComEd, "in their responsibility for management and oversight of matters relating to the financial condition and risk exposures faced by the Company and the assessment, monitoring, and control of the Company's financial objectives, policies, and condition and the management of the risks it faces." The conduct of the Risk Committee is governed by the Risk Committee Charter (the "Risk Charter").

60.     Pursuant to the Risk Charter, the Risk Committee "shall assist the Audit Committee in its review of guidelines and policies to govern the process of risk assessment and risk

management and in its review of financial reporting policies and procedures." The Risk Committee is also responsible for "ensuring that there is a Risk Management Program within the Company and its subsidiaries that measures, prioritizes, monitors and responds to the risks and monitors and evaluates compliance with risk management policies."

61. Such risks are identified in the Risk Charter as including "reputation risks" and, further, tasks the Risk Committee with reviewing "significant legal matters."

62. Like the Risk Committee, the Audit Committee is also governed by a Charter (the "Audit Charter") which defines its basic function and purpose as follows:

> The Audit Committee assists the Board of Directors in fulfilling its responsibility to oversee and review (a) the integrity of the Company's financial statements, (b) the independent auditor's qualifications and independence, and (c) the performance of the Company's internal audit function and the independent auditor. The Committee must prepare the report that the Securities and Exchange Commission rules require to be included in the Company's annual proxy statement. The Committee, with the advice and assistance of the [Risk Committee], also discusses policies with respect to risk assessment and risk management and assists the Board of Directors in fulfilling its responsibility to oversee the Company's compliance with legal and regulatory requirements. In addition, the Committee oversees and reviews officers' and directors' expenses, compliance with appropriate Company policies, and the Code of Business Conduct.

63. The Audit Charter thus delegates responsibility for the following financial reporting tasks to the Audit Committee:

- Review a report from the independent auditor at least annually regarding (a) the independent auditor's internal quality-control procedures, and (b) any material issues raised by the most recent internal quality-control review, or peer review, or by the public company accounting oversight board, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm, and any steps taken to deal with such issues.
- ***Consider and review with the independent auditor and management: (a) the adequacy of the Company's internal controls***; (b) emerging accounting standards and issues affecting the Company; and (c) any significant and related findings and recommendations of the independent auditor, together with management's response. The Committee shall discuss with the independent auditor the auditor's judgments about the quality, not just the adequacy, of the

Company's accounting principles as applied in its financial statements. This discussion, usually with management present, will include such matters as consistency, clarity and completeness of the disclosures, as well as items having a significant impact on the representational faithfulness, verifiability, neutrality and consistency of the accounting information. The Committee shall also discuss with the independent auditor and management significant financial reporting issues and judgments made in connection with the preparation of the Company's financial reports, including any significant changes in the Company's selection or application of accounting principles.

- Review with management, on at least an annual basis, the Company's disclosure controls and procedures, including the certification process in connection with the requirements of the Sarbanes-Oxley Act of 2002 and the regulations of the Securities and Exchange Commission.

- Review disclosures by the Company's Chief Executive Officer and Chief Financial Officer during their certification process for the Form 10-K and Form 10-Q about any significant deficiencies or material weaknesses in the design or operation of internal controls and any fraud involving management or other employees who have a significant role in the Company's internal controls.

64. The Audit Charter also delegates responsibility for the following internal auditing tasks to the Audit Committee:

- Review and approve the internal audit risk assessment, annual work plan, staffing, organizational structure, and annual budget.

- Review and approve the Internal Audit Charter on an annual basis.

- Review the effectiveness of the internal audit function, including compliance with the Standards for the Professional Practice of Internal Auditing of the Institute of Internal Auditors.

- Concur in the appointment, replacement or dismissal of the internal auditor.

- Confirm that there are no unjustified restrictions or limitations on internal audit.

- Review the coordination of audit efforts between the internal audit staff and the independent auditor to ensure completeness of coverage and efficient use of audit resources.

- Review with management and the internal auditor significant internal auditing findings and recommendations related to the adequacy of internal controls, compliance with policies and procedures, and effective and efficient use of Company resources, as well as management's response to the audit recommendations.

- Meet separately with the internal auditor, at least quarterly, to discuss any matters that the Committee or the internal auditor believe should be discussed privately.

65. Most importantly, the Audit Charter delegates to the Audit Committee the responsibility for oversight of officers and directors. In doing so, the Audit Committee must review "policies and procedures with respect to the ***prevention of illegal payments***, conflicts of interest, or other questionable practices; and consider the results of monitoring of compliance with the [Code], particularly by officers and directors." The Audit Committee's oversight responsibilities also include "oversee[ing] the Company's policies and procedures for compliance with applicable laws and regulations and related risk assessments."

## SUBSTANTIVE ALLEGATIONS

### A.    BACKGROUND OF EXELON'S BUSINESS

66. In the United States, most electricity is consumed over systems called "grids" which consist of equipment like power lines, transformers, and other facilities which transport and store energy or increase or decrease voltage for various purposes. Because the cost of establishing such infrastructure is prohibitively expensive, and duplication within a geographic area is unnecessary, most utility companies have a monopoly over a geographic area by virtue of the contracts they execute with municipal entities. In turn, the contracts prevent the utility providers from misusing their monopoly powers by establishing public utility commissions ("PUCs") to regulate the rates the utility companies can charge for services.

67. To deal with fluctuations in demand, most regions have connected their grids through regional transmission organizations ("RTOs"). RTOs create competitive markets where supply and demand can be managed by wholesaling electricity from one grid to another. These markets are sophisticated enough that they allow not only "energy market" auction of excess production, but also "capacity market" auctions, where grids can sell their capacity to provide other grids with energy in the future. In other words, a capacity market auction allows grids to submit bids for others to purchase their "capacity," which one grid to provide another electricity

19

in times of the recipient's shortages, such as peak demand or distress.

68.     Exelon Generation is the subsidiary holding company under which Exelon produces all of its electricity, whereas Exelon Utilities is the subsidiary holding company under which Exelon distributes electricity to consumers. Exelon Generation owns and/or manages several nuclear, fossil fuel, renewable energy power plants throughout the United States and Canada.

69.     ComEd is the largest of six utility providers under Exelon's umbrella; it generally accounts for more than 30% of Exelon's total net income. ComEd is a controlled subsidiary of Exelon and, as such, the ComEd Board does not maintain separate audit, nominating, or compensation committees. Rather, all of these functions are performed by the Exelon Board.

70.     ComEd cannot profit from marking up the electricity it sells to consumers. Rather, the PUCs require it, like all utility companies, to resell electricity to consumers at the same price it paid to purchase it wholesale from RTOs. Thus, ComEd's profits derive from delivery service fees which allow it to receive a specified return on its investments at rates set by PUCs. In sum, the higher ComEd's investments in the area's grid (also known as the "rate base"), the higher its profits. The profit allure of a higher rate base provides ComEd with incentives to invest in infrastructure. However, PUCs typically review proposed infrastructure projects to ensure they are justified, prudent, and not needless spending solely for the purpose of increasing a utility company's rate base at the expense of consumers.

71.     Because utility company profits are thereby so dependent on government approval of its investments and the subsequent rate base increases those investments cause, Exelon's Code emphasizes how the Company and its subsidiaries can only be successful "if we operate our Company, employ our people and finance our business in accordance with the highest ethical

standards and with the law. We will destroy shareholder value if we do not."

## B.     THE LONG-RUNNING BRIBERY SCHEME

72.     Until his retirement, Madigan, a protégé of long-time Chicago Mayor and Democratic party leader Richard J. Daley ("Daley"), was one of the longest-serving legislators in the country. In 1970, Madigan gained a seat in the House of Representatives of the Illinois General Assembly (the "Illinois House") and rose to prominence to become Speaker by 1983. Madigan held that leadership position for all but two years until 2021, when he gave up the gavel upon the indictment of the ComEd Four, which implicated him in the bribery scheme. Prior to his retirement, Chicago media referred to Madigan as the "King of Illinois." As both Speaker and head of the Illinois Democratic Party, Madigan could influence the makeup of legislative committees, influence how other lawmakers voted, and even block bills from being called for a vote on the floor of the Illinois House.

73.     Under Daley's tutelage, Madigan mastered the art of using what he euphemistically referred to as a "patronage system" to solidify the loyalty of his supporters and party members through a network of bribery and conspiracy. Namely, in return for Madigan's support on favorable legislation or regulatory approvals, companies were enticed to set aside numerous lucrative "make work" roles for Madigan's supporters. These roles involved little to no work and had the added benefit of allowing Madigan to cement his political power by keeping his supporters loyal through the implied threat of loss of income.

74.     Although the then-COO of ComEd, Pramaggiore, was initially reluctant to participate in Madigan's patronage system, she soon enthusiastically adopted it once she observed how traditional lobbying was not gaining ComEd the victories it desired. Namely, after receiving a promotion to CEO of ComEd, Pramaggiore traveled with Madigan to Turkey for a trade trip.

Pramaggiore also publicly referred to Madigan and his longtime confidant and ComEd lobbyist, McClain, as her "spirit guides." After Pramaggiore's ties with Madigan were established, however, she communicated with Madigan primarily through McClain, the lynchpin of the bribery scheme. McClain, in ferrying communications between Madigan and Pramaggiore, routinely referred to Madigan euphemistically as "our friend" or "the Speaker" to avoid calling attention to the bribery scheme.

75.     Specifically, as part of the bribery scheme, Pramaggiore agreed to: (a) provide make-work jobs to Madigan supporters, often through subcontractor agreements; (b) preferentially consider internship applicants from Madigan's ward, including waiving academic requirements when necessary; (c) retain the firm of Reyes Kurson Ltd. ("Reyes Kurson") and annually bill at least 850 hours to it; and (d) appoint Madigan's ally, Juan Ochoa, to the ComEd Board.

76.     In return, Madigan agreed to support and advocate for ComEd's legislative priorities, such as major legislation and other overrides of adverse regulatory decisions, which collectively benefitted ComEd by more than $100 million.

77.     McClain, in his role as the lynchpin of the bribery scheme, served as the mouthpiece for Madigan at ComEd. Specifically, McClain was elected to the Illinois House only two years after Madigan gained his seat and thereafter circled within his orbit until McClain lost a reelection campaign. McClain then became a lobbyist and consultant for ComEd, where his coworkers called him a "double agent" because of his known loyalty to Madigan. Indeed, McClain himself knew his value as ComEd's lobbyist derived from his connections to Madigan, going so far as to assure a Madigan staffer, "my client is not ComEd … my client is the Speaker." McClain's influence with Madigan was so invaluable to ComEd that Pramaggiore told McClain his electoral loss in 1982 "saved" ComEd.

78.     McClain, in his role overseeing the patronage system for Madigan, pushed ComEd to hire Madigan supporters, even if they were wholly unqualified. For instance, one summer intern whom Madigan instructed McClain to attempt to get hired, had a 1.1 college grade point average, which was so low ComEd outright refused to hire her. Another summer associate, who found work in ComEd's legal department, was so unqualified that the Company had to hire seven summer associates, instead of the usual six, and McClain himself acknowledged "he will not learn very much, and he will not be able to contribute much, if anything."

79.     McClain regularly compelled ComEd's and Exelon's Chief Legal Officer and General Counsel, Thomas O'Neill ("O'Neill"), to select Madigan supporters for legal positions within the Company. McClain also pressured O'Neill to direct work to the law firm Reyes Kurson, after Madigan forced ComEd to retain and bill it no less than 850 hours annually as a favor to Madigan's longtime fundraiser, Victor Reyes, the co-founder of Reyes Kurson. In the midst of Madigan's push to get FEJA passed in 2016 for ComEd's benefit, O'Neill received repeated reminders about Reyes Kurson's annual billing guarantees.

80.     Later, when O'Neill resisted renewing Reyes Kurson's contract because of how little work Reyes Kurson performed for the Company, McClain warned Pramaggiore to "get involve[d] and solve this issue" or the firm would go to "our friend," Madigan, who would call McClain and thus force McClain to call Pramaggiore. "Is this the drill we must go through?" McClain asked. Pramaggiore personally intervened, and Reyes Kurson's contract was renewed.

81.     Along with McClain, ComEd in-house lobbyist and Senior Vice President of Government Affairs, Marquez, served as an invaluable go-between in the bribery scheme. In January 2019, Marquez was approached by the USAO as part of its investigation, which presumably presented Marquez with evidence of his substantial involvement in the scheme. In

return for leniency, Marquez agreed to wear a wire and later testify against the ComEd Four.

82.     Also central to the bribery scheme and part of the ComEd Four, contracted ComEd lobbyist Hooker had a close relationship with McClain and Pramaggiore by virtue of his former role as Vice President of Government Affairs at ComEd. Hooker and McClain bragged they were the "masterminds" of the bribery scheme.

83.     As the final member of the ComEd Four, Doherty, a politically connected ComEd consultant and contractor, provided the majority of the subcontracted make-work jobs for Madigan's supporters for his own substantial personal gain. Namely, because Doherty knew his role was key to the bribery scheme and, consequently that his skills were necessary to secure ComEd the valuable rate increases it desired, Doherty forced ComEd to provide him with generous reimbursement for his services. While Marquez was wearing a wire, Doherty acknowledged those he employed on Madigan's behalf did not do any real work but knew to "keep their mouth shut."

84.     For example, Madigan secured the free political labor of his precinct co-captain Edward Moody ("Moody") by having McClain broker an annual $45,000 contract between Moody and ComEd. Later, Doherty upgraded Moody's contract to require even less work in exchange for $4,500 per month. While the contract resulted in little to no benefit to ComEd, it provided substantial benefits for Madigan, who told Moody, "I control that contract and if you stop doing political work, you'll lose that contract." All told, ComEd paid Moody—who later publicly described himself as one of Madigan's "foot soldiers"—more than $350,000 and later sponsored Moody for various other valuable contracts.

85.     Madigan also rewarded Michael Zalewski ("Zalewski")—a former Chicago Alderman, longtime Madigan ally, and the father-in-law of the Chairperson of the ICC—with a $5,000 per month contract with Doherty, paid by ComEd, in return for no work. Although

Pramaggiore and Marquez agreed to the arrangement, they allowed Madigan to inform Zalewski of the contract himself to drive home the fact that Zalewski's receipt of benefits from ComEd, paid indirectly through Doherty, were contingent on his continued loyalty to Madigan.

86.    Madigan also secured a plush appointment to the ComEd Board and $78,000 in annual compensation for Ochoa as a favor to former Illinois Congressman Luis Gutierrez, a longtime supporter of Madigan and a close friend of Ochoa. When Pramaggiore told McClain that there was some "internal company opposition" to Ochoa's appointment because of his personal financial troubles and close ties to Madigan, McClain told her that Madigan said money issues should not be disqualifying; after all, President Harry Truman filed for bankruptcy once. McClain also joked he should take the ComEd Board position for himself if it paid $78,000 annually. Pramaggiore reassured McClain she would do "the best I can do, to take care of you" because "you take good care of me, and so does our friend." On April 25, 2019, Pramaggiore wrote that she had "sent out Board approval to appoint [Ochoa] to ComEd Board." In a proxy statement filed with the SEC the next day, ComEd identified that Ochoa "has served as a Director of ComEd since April 2019" and notified that, as ComEd's majority shareholder, Exelon would take action by written consent to elect Ochoa to the ComEd Board on or about June 10, 2019.

87.    Pramaggiore and Hooker, through their respective fields of influence, also kept others in line. Namely, Pramaggiore remained an active participant in the bribery scheme even after she left her role as CEO of ComEd and was promoted to CEO of Exelon Utilities. For example, Pramaggiore told Marquez to manipulate Dominguez, her successor as ComEd's CEO, to get Dominguez to stop resisting the subcontractor arrangements with Doherty's firm which were costing the Company millions. Similarly, Hooker warned Dominguez against ending other agreements, telling him that if Madigan knew, he might withdraw his support of legislation

favorable to ComEd.

88.     Exelon also solicited Madigan for favors as well. In one call between McClain and Marquez, McClain mentioned he told Madigan about something Exelon needed to accomplish legislatively and revealed that Madigan was interested in getting in contact with a point person who could be discreet. McClain and Marquez discussed hiring McClain himself, or Hooker and also floated the idea of rewarding Madigan allies Zalewski or Will Cousineau ("Cousineau"), one of Madigan's longtime political directors, by appointing them as point person between Madigan and Exelon.

89.     Although the scheme between ComEd and Madigan mostly centered around Madigan's euphemistically named patronage system, it occasionally involved explicit bribery through the solicitation or offering of quid pro quos. For example, in August 2016, when ComEd was lobbying for passage of FEJA, McClain told Marquez that "our friend" had asked ComEd to increase its direct contributions from $250,000 to $450,000 to a "Magic Lobbying List" of lobbyists and other Madigan supporters. Indeed, the USAO later found the handwritten list when it raided Madigan's home.

90.     The media itself noted that the Company went to "unusual lengths" to influence Madigan by hosting fundraising events that raised more than $100,000 for his campaign and party every year from 2014 through 2019. The Company did not host similar events for other Illinois politicians or the opposing party. These events were endorsed by top-level executives as evidenced by the fact that Pramaggiore and Madigan were typically the keynote speakers.

91.     The ComEd Four and others thus facilitated the Company's bribing of Madigan to enable the legislative victories Exelon desired by wasting approximately $1.3 million of corporate resources in direct contributions and the establishment of various make-work roles for Madigan

supporters that provided no benefit to the Company.

92.     This bribery scheme, which began in 2011, did not cease until the DPA was announced in July 2020, thereby causing substantial financial and reputational damage to the Company that continues to this day.

## C.     THE BRIBES RESULT IN THE PASSAGE OF FAVORABLE LEGISLATION

93.     There were plenty of reasons to get involved in Madigan's patronage system. Namely, Exelon and its subsidiaries operate in a highly regulated environment. As the Company's SEC filings continually emphasized, "[s]ubstantially all aspects of [the Company's] businesses" are subject to comprehensive government regulation and legislation. As such, the Company has repeatedly disclosed "[i]ssues vital to Exelon's ability to recognize value for its stakeholders" are decided in "state legislatures and local forums across the country." The Illinois General Assembly, as the legislative branch of Illinois, considers and passes legislation that directly impacts ComEd's and Exelon Generation's profitability, and therefore Exelon's overall profitability. These legislative decisions, and the regulatory decisions thereafter made by the ICC—the PUC responsible for regulating ComEd's rate base—impact the rates ComEd can charge its customers and determine whether Exelon Generation's six Illinois nuclear power plants can receive valuable public subsidies. Thus, if Exelon could ensure the passage of favorable legislation, it would guarantee it and its subsidiaries many millions in additional profits.

94.     Exelon and ComEd had been engaged in considerable lobbying efforts, such as hiring outside lobbyists and employing internal lobbyists solely dedicated to Illinois, for years. However, prior to 2011, the Company had a poor relationship with Madigan and its lobbying efforts were failing. For example, Madigan torpedoed a proposed ComEd rate hike in 2003, which started what Chicago media called "four years of hot and cold warfare" between Madigan and

Exelon and ComEd's then-CEOs, John Rowe ("Rowe") and Frank M. Clark ("Clark"), respectively. Also in 2003, Madigan told other members of the Illinois House not to trust Exelon and accused it of being deceptive about its desire to increase consumer rates. In 2006, Madigan wrote a letter requesting that the Illinois Governor call a special session to consider passing legislation that would freeze ComEd's rates until 2010. Therein, Madigan wrote that Exelon enjoyed "record earnings and profits [and] exorbitant gains for their executives and shareholders at the expense of working families, senior citizens, and those on fixed incomes."

95.     In 2007, ComEd finally secured a rate increase only with the steadfast backing of the then-Illinois Senate President, who retired in 2008. Thereafter, left with no powerful allies, Exelon made it a priority to curry favor with Madigan and his vast network of supporters. At an investor conference in 2009 and in 2010, Clark, the former CEO of ComEd, specifically mentioned the "challenging regulatory atmosphere" in Illinois. However, by May 2010, it was apparent that the Company's lobbying efforts were going nowhere, as one of its proposals to increase its rate base through infrastructure investments was swiftly pulled from consideration in the Illinois House. During this time, the ICC also regularly approved rate bases far below ComEd's requests. For example, in 2010, ComEd requested rates that would result in a revenue of $343 million, but the ICC approved only $143 million.

96.     Off the back of its legislative failures and with its participation in Madigan's patronage system newly established, ComEd was heavily involved in the drafting of EIMA in 2010 and, with Madigan's help, introduced it to the floor of the Illinois House in February 2011. EIMA would help ComEd by vastly overhauling how ComEd's rates were determined.

97.     Specifically, EIMA established new "formula rates" which essentially took decision-making power from the ICC and set them on autopilot. These formula rates also

28

guaranteed ComEd a specific return on its investments. For example, if an annual revenue from the formula rates fell short of ComEd's expenses that year, the formula rates would automatically increase the following year to make ComEd whole. Most importantly, however, EIMA authorized ComEd to spend roughly $3 billion on grid infrastructure, drastically increasing its rate base.

98.     Because EIMA was so favorable to ComEd's bottom lines and ComEd was so explicitly and publicly involved in its drafting, EIMA faced significant opposition from consumer advocacy groups and some politicians, both of whom accused ComEd of seeking to increase rates on Illinois consumers for its own benefit.

99.     With Madigan's help, however, EIMA passed the Illinois House in May 2011 and the Illinois Senate in August 2011 by simple majorities. However, Quinn, the then-Governor of Illinois, vetoed it, calling EIMA a "sweetheart deal" for ComEd and accusing ComEd of trying to "dramatically change the rules to guarantee annual rate increases." Further, Quinn emphasized how EIMA "strips away vital oversight and allows these utilities to benefit from unnecessary costs, higher corporate profits, and inherently flawed performance standards."

100.    After Quinn's veto, Crane assured stockholders that Exelon was working to gather the necessary votes to override the veto. However, Crane falsely claimed the success of EIMA turned on the Company's traditional lobbying efforts like "stakeholder support." In truth, as the Company would eventually be forced to admit in the DPA, its bribery of Madigan, rather than traditional lobbying, facilitated the passage of EIMA.

101.    Indeed, on October 26, 2011, the Illinois House overrode Quinn's veto with a supermajority vote, allowing EIMA to become effective immediately. This legislative victory was immediately noted favorably by analysts. For example, an October 27, 2011 Bank of America report credited ComEd from turning "one of the most difficult regulatory environments in the

country" into the possibility of "one of the better ones in the U.S." Deutsche Bank increased their valuation of ComEd by 5% and Morningstar Equity Research estimated EIMA would allow ComEd to increase its base rate by up to 30%.

102.    The honeymoon did not last long, as ComEd soon became embroiled in a legal battle with the ICC over the interpretation of EIMA's provisions. Namely, in 2012, the ICC reduced a ComEd rate request by approximately $100 million. With the support of Madigan assured, ComEd soon drafted what was effectively a legislative veto on the ICC—the 2013 Senate Bill 9, which clarified EIMA's language in favor of ComEd's rate hikes. Exelon's then-CFO bragged the bill would increase operating revenues by $65 million by 2014.

103.    2013 Senate Bill 9 passed the Illinois House and Senate but was once again vetoed by then-Governor Quinn, who issued a statement that he "cannot support legislation that puts the profits of big electric companies ahead of the families and business of Illinois." McClain forwarded Quinn's statement to Madigan with the subject line "To Provide … We Must Override!"

104.    The Illinois House overrode Quinn's veto on May 22, 2013 to pass 2013 Senate Bill 9. A week later, Crane bragged about the Company's ability to push EIMA and 2013 Senate Bill 9 over the Governor's vetoes.

105.    EIMA, however, was scheduled to expire in 2017, ending ComEd's favorable formula rates and increased rate base unless the legislation was extended. With the help of Madigan, the extension was put on the Illinois House floor for a vote, which passed. On April 3, 2015, then-Governor Brice Rauner ("Rauner") signed the extension into law, extending EIMA to 2019. In a later earnings call, Defendant Pramaggiore called EIMA "a game-changer for ComEd." Pramaggiore highlighted how the Company was "able to persuade policymakers" that the ComEd's investment in Illinois' grid "required a regulatory model different from the volatile

model that we had been living with … [s]o we designed a formula rate that provides greater predictability, as well as timely cost recovery." Pramaggiore added that "of the approximately $4.2 billion of rate base growth at ComEd over the next five years, 100% will be recovered through existing formula and rider mechanisms that have served us well over the past 4.5 years."

106.    However, ComEd was not the only subsidiary owned by Exelon with regulatory woes. Namely, in 2015, Exelon was forced to disclose to stockholders that two of its Illinois nuclear power plants, both owned by Exelon Generation, were so unprofitable they would have to be mothballed unless the Illinois government bailed them out. Because Exelon Generation operated six such nuclear plants in Illinois, the loss of approximately a third of its nuclear capacity would result in significant financial harm to the Company.

107.    Thus, Exelon developed a new bill, FEJA, which would result in Exelon Generation receiving significant clean energy subsidies (called "Zero Emission Credits" or "ZECs") to operate its nuclear plants. Exelon touted the bill as saving the jobs of thousands of workers and advancing the goals of Illinois to reduce carbon emissions.

108.    Like EIMA, FEJA was met with significant opposition. Aside from the usual anti-nuclear suspects, some critics thought the subsidies were unnecessary and Exelon's threats to close half of its nuclear plants were toothless, given the Company's overall profitability. Other skeptics wondered why lawmakers were so eager to debate sweeping legislation while embroiled in negotiations over the hotly contested 2017 budget.

109.    Despite the Illinois House not yet having passed the state's annual budget, it nevertheless passed FEJA on December 1, 2016, the final day of the fall legislative session. One representative was quoted as asking "What are we doing, you guys? We don't have a budget and our so-called stopgap budget is just weeks away from expiring. Instead, we are talking about a

multibillion-dollar corporate bailout for one of the most profitable companies in the state." Another, when looking back on the vote, said, "The whole day was bad. It was dirty, and I felt like I needed a shower driving home."

110.    On December 7, 2016, then-Governor Rauner signed FEJA into law. Among other things, FEJA provided Exelon an annual bailout of $235 million for ten years, for a total of $2.35 billion, to keep its nuclear plants operating until at least 2027. The bailout appeared on consumers' bills as a "ZED" paid directly to Exelon Generation and resulted in up to $4 monthly increases for millions of Illinois customers.

111.    FEJA went further than passing bailouts through to consumers, however. It also extended EIMA's formula rates for another three years, through 2022, and authorized ComEd to earn approximately $350 million in "energy efficiency" infrastructure investments. Before FEJA, while EIMA did provide methods allowing ComEd to increase consumer rates through grid investments that increased its rate base, EIMA did not allow increases to the formula rate through investments. Now, with FEJA, EIMA would provide two avenues for ComEd to increase rates.

112.    As with EIMA, the Company falsely attributed its legislative successes with FEJA to legitimate lobbying activities like "coalition building" and courting "stakeholder support." In truth, as the Company would later be forced to admit in the DPA, the bribery scheme, not traditional lobbying, facilitated the passage of FEJA. Indeed, Exelon celebrated the passage of FEJA by throwing a party for 1,000 of its supporters. The guests of honor included those most central to the bribery scheme—Pramaggiore, Madigan, and McClain.

113.    Exelon then quickly sought another state bailout for three more of its six nuclear plants. On May 24, 2018, Exelon disclosed that a third plant did not have its bids purchased in the annual RTO capacity auction, and that only a small portion of a fourth plant's bids were purchased.

Exelon stated that the "results underscore the urgent need for policy. Later, Exelon disclosed the third, fourth, and an additional fifth Illinois nuclear plant were showing "increased signs of economic distress" and may need to be shut down unless legislation was enacted.

114.    In February 2019, CEPA was introduced in the Illinois House. CEPA would require ComEd, through the ICC, to buy its "capacity" through Exelon's nuclear plants, meaning the plants would go from selling little to no capacity in the RTO to selling all of its capacity to ComEd in a fixed resource requirement ("FRR"), thereby providing Exelon, and its struggling nuclear plants, a guarantee of hundreds of millions of dollars in revenue. ComEd, in turn, would pass the increased costs on to the consumers. In the same month, House Bill 3152 was introduced to the Illinois General Assembly, providing for the extension of the EIMA formula until 2032.

115.    In addition to legislation pending in the Illinois House, the Company was involved with negotiations with the city of Chicago, as ComEd's franchise agreement with the city was set to expire at the end of December 2020. It was absolutely vital for ComEd to succeed in renewing the contract on substantially the same or more favorable terms rather than allowing the city to increase franchise fees or even take over electricity delivery.

116.    Even before the passage of CEPA, House Bill 3152, and the successful renegotiation of ComEd's Chicago contract, the financial benefits to Exelon and ComEd from their legislative victories through EIMA and FEJA were substantial. Namely, ComEd's net income nearly doubled between 2016 and 2019, increasing from $378 million in 2016 to $688 million in 2019, and Exelon's net income nearly tripled, increasing from $1.13 billion in 2016 to $2.9 billion in 2019.

### D.    THE SCHEME IS CONCEALED FROM EXELON SHAREHOLDERS

117.    Until the announcement of the DPA, however, Exelon favorably reported its

performance to stockholders and the public by making numerous false and misleading statements which, in turn, artificially inflated the price of Exelon's shares. Namely, the Company's claimed legislative successes were attributed to legitimate lobbying activities, rather than how ComEd's top executives had been engaged in a multiyear, undisclosed bribery scheme that would soon expose the Company to massive criminal penalties and a significantly diminished public reputation.

118.    For example, between 2011 and 2019, Exelon published on its website its "Political Contributions Reports." Therein, Exelon claimed its contributions were all made in accordance with its Code and each report contained a complete listing of Exelon's "political contributions for the above noted reporting period." None of these reports, however, reported the significant bribes ComEd delivered to Madigan's allies.

119.    Exelon's SEC filings were also replete with omissions, misleading statements, and explicit falsehoods. For example, the Company's FY2018 Report, filed with the SEC on February 8, 2019, reported that Exelon "continues to work with stakeholders on state policy solutions" regarding risks to ComEd's operations and further detailed how the passage of FEJA positively impacted revenues. The FY2018 Report did not mention how ComEd's "state policy solution" consisted of bribing the Speaker of the Illinois House to pass FEJA and other favorable legislation while weakening the ICC's regulatory controls. Crane, Pramaggiore, and Dominguez signed the FY2018 Report.

120.    The FY2018 Report also specifically identified how "increased regulatory oversight and more stringent legislative or regulatory requirements" posed a risk to the Company's finances, without disclosing how ComEd had bribed Madigan to support legislation which significantly weakened the ICC's regulatory abilities.

121.    In discussing the FY2018 Report in a conference call with stockholders and analysts, Defendant Crane received a question directly asking for "update[s] on sort of efforts to engage the legislature in Illinois." In response, Crane obliquely reported, "we have our folks communicating in those coalitions and communicating with the legislative folks" without mentioning that the "communications" in question primarily involved the issuance of bribes to Madigan and his allies.

122.    On March 20, 2019, the Company's directors and officers caused Exelon to file the Company's annual Proxy Statement on Schedule 14A (the "2019 Proxy"), therein pointing to Exelon's "Risk Management Committees" and how they were comprised of "select senior officers including the chief executive officers," including the Exelon CEO, who "meet regularly" to, among other things, "ensure that processes are in place to identify and assess … as well as measure and manage risk exposures." The 2019 Proxy, however, omitted that several senior officers inappropriately "managed risk exposures" created by the bribery scheme by either actively participating therein or, despite knowledge thereof, passively going along with the same.

123.    On March 31, 2019, the Company's directors and officers caused Exelon to file Exelon's Quarterly 10-Q Report for the first quarter of 2019 (the "1Q19 Report"). The 1Q19 Report specified that Exelon was "working with legislators and stakeholders" regarding the ongoing legislative tinkering regarding FEJA, which had proven to be favorable so far to Exelon, and stated that "revenue increased during the three months ended March 31, 2019, as compared to the same period in 2018, primarily due to the impact of higher rate base." However, the 1Q19 Report did not disclose that the Company was "working with legislators" by bribing the Speaker of the Illinois House to weaken regulatory controls, which was what allowed ComEd to charge the "higher rate base" in the first place. Crane and Dominquez signed the 1Q19 Report.

124.   Exelon's 1Q19 Report also repeated the risk factors identified in its FY2018 Report without disclosing how ComEd was issuing bribes to reduce those risks while substantially increasing others. Further, the 1Q19 Report disclosed the appointment of Ochoa to ComEd's Board without mentioning the significant internal debate over Ochoa's qualifications and the fact that Madigan had requested his appointment as part of the illegal bribery scheme.

125.   In a May 2, 2019, earnings call with stockholders and analysts to discuss Exelon's 1Q19 Report, Defendant Crane discussed how the Company's legislative priorities in Illinois could alter the formulas for ComEd's rates. Crane described the legislation as "ensur[ing] that consumers pay less than they do today" while ComEd made "investments and improve[d] reliability and resiliency in customer service while keeping the bills affordable." However, these statements were not only misleading, but also incorrect—ComEd was bribing Madigan to push his coalition to dismantle the regulatory oversight of the ICC, thereby allowing ComEd to increase, rather than decrease, customer rates.

## E.   THE TRUTH BEGINS TO EMERGE AS MISREPRESENTATIONS CONTINUE

126.   On November 29, 2018, the first news related to an aggressive public corruption investigation in Illinois broke when federal agents executed a search warrant at the office of powerful Chicago Alderman Edward Michael Burke ("Burke") without warning. The public did not know at the time that ComEd, Exelon, or Madigan would eventually be implicated in this sweeping federal investigation of corruption in Illinois. Later, testimony at the trial of the ComEd Four would reveal that the Federal Bureau of Investigation ("FBI") and USAO had opened the investigation nearly four years earlier, in late 2014.

127.   Unbeknownst to the public or ComEd, the FBI confronted Marquez with evidence it had already gathered against him in its corruption investigations, causing Marquez to agree to

secretly cooperate with the government and surreptitiously tape other ComEd executives and lobbyists while they engaged in activity related to the bribery scheme.

128.    In an affidavit obtained by the *Chicago Sun-Times* on January 29, 2019, the public learned of how the FBI had already, years prior, identified Madigan as a person of interest when it recorded him soliciting a Chicago developer to participate in his "patronage system" by hiring Madigan's law firm in return for valuable approvals planned developments. The reporting, however, did not mention ComEd or Exelon. Those individuals involved in the bribery scheme recklessly continued, unimpeded by internal controls, in their plan to use Madigan to introduce CEPA and House Bill 3152 to the floor of the Illinois House in February 2019.

129.    On May 14, 2019, the FBI executed a search warrant at McClain's home. WBEZ Chicago ("WBEZ"), a public news organization affiliated with NPR, reported "sources familiar with the investigation say they were seeking records regarding Speaker Madigan." The WBEZ report further specified that Exelon and ComEd had received a grand jury subpoena for records related to the ongoing investigation led by the USAO.

130.    On July 15, 2019, Exelon filed a Current Report on Form 8-K (the "July 2019 Current Report") with the SEC finally disclosing that Exelon and ComEd had received a grand jury subpoena "requiring production of information concerning production of information concerning their lobbying activities in the State of Illinois." The July 2019 Current Report failed to reveal the raid on McClain's home, the severity of the allegations against the Company, or how the subpoena was part of a high-profile investigation of corruption in Illinois.

131.    On July 18, 2019, the *Chicago Tribune* (the "*Tribune*") reported further details concerning the FBI's raid on McClain's home in May 2019. Namely, the *Tribune* called McClain a "longtime ComEd lobbyist who is a close confident of Speaker Madigan" and the longtime "point

man" in "discussions about major ComEd and parent company Exelon legislation." Moreover, the *Tribune* pointed out that McClain retired as a lobbyist very shortly after the passage of FEJA, which "raised electricity rates on Illinois residents and helped bail out a pair of Exelon's nuclear power plants." The *Tribune*, for the first time, also explicitly connected the raid to the USAO's larger corruption investigations, detailing how two other close associates of Madigan also had their homes raided at the same time, such as Zalewski, one of ComEd's subcontractors receiving payments from Doherty for performing no work. Namely, the *Tribune* specified, "Among the information the FBI was seeking in that raid were records of interactions among Madigan, McClain and Zalewski related to attempts to get ComEd lobbying work for Zalewski."

132. After the news belatedly broke about the raid on McClain's home, Exelon's share price lost more than $1 in value in a single day, costing the Company $1.1 billion in market capitalization.

133. On an August 1, 2019, on an earnings call with stockholders and analysts to discuss the financial results of the second quarter of 2019 ("2Q19"), Defendant Crane addressed the subpoena. However, Crane downplayed the risks that the investigation posed to Exelon, simply stating that the Company was "providing all information requested by the [USAO]", while refusing to "speculate on whether [the investigation] may affect legislative efforts." Crane then immediately pivoted to making misleading euphemisms about how Exelon was continuing to "work[] with stakeholders to help crack" the upcoming vote on CEPA, without mentioning the role the years of bribery had played in introducing CEPA, along with other favorable legislation, to the Illinois House in the first place.

134. In the same earnings call, Von Hoene, who was then a Senior Vice President at Exelon, explicitly stated that "the grand jury and subpoenas had no impact on the level of activity

and intensity of activity" the Company had committed towards its "stakeholder outreach," namely,

an oft-repeated code word for bribes. During the call, Pramaggiore also talked about how ComEd's

contract with Chicago was expiring in December 2020, claiming the city's "priorities are very

much aligned with ours." Neither Von Hoene nor Pramaggiore publicly stated how the severity of

the allegations and the Company's involvement in illegal activity would pose a substantial risk to

Exelon's future negotiations for CEPA and ComEd's work on the contract with Chicago.

135.    On August 1, 2019, Exelon filed its Quarterly 10-Q Report for the second quarter

of 2019 (the "2Q19 Report") with the SEC, therein claiming its risk factors were "consistent" with

those disclosed in its FY2018 Report and repeating its past misrepresentations about its lobbying

activities and how FEJA increased its revenues without disclosing the bribery scheme's necessary

role. Crane and Dominguez signed the 2Q19 Report.

136.    The Individual Defendants' obfuscation of the severity of the allegations was

successful, as analysts continued to make positive forecasts. For instance, Credit Suisse analysists,

on August 13, 2019, stated Exelon was not a risk because there was "unbowed" support for CEPA.

Indeed, many analysts emphasized how media reporting on the investigation and Exelon's public

statements noted the government was focusing on Madigan himself, and how Madigan had

allegedly taken sizeable payments from *external* ComEd lobbyists.

137.    On October 9, 2019, Exelon filed another Current Report on SEC Form 8-K (the

"October 2019 Report") disclosing how Exelon and ComEd had received a second grand jury

subpoena. The October 2019 Current Report also revealed that Exelon's Board had formed a

Special Oversight Committee (the "SOC") consisting solely of independent directors to oversee

both companies' compliance and cooperation with the subpoenas. The October 2019 Report

neither disclosed the names of those selected for the SOC, nor the severity of the conduct the SOC was tasked with investigating.

138.     On October 15, 2019, Exelon issued a press release announcing the departure, "effective immediately," of Pramaggiore, who had served as CEO of ComEd since 2011 and was promoted to CEO of Exelon Utilities and Vice Chairman of the ComEd Board in early 2019, less than six months prior to her resignation. Analysts, noting the abrupt nature of Pramaggiore's exit from the Company, immediately identified the two subpoenas and the ongoing federal investigation as the cause.

139.     As a result, Exelon's share price fell $2.15 and closed about 5% below its opening price on October 16, 2019, erasing another $2 billion in market capitalization in a single day. Morgan Stanley analysts highlighted how potential future damage to the Company could include "a degradation in the relationship between [it] and legislators and regulators in Illinois." In particular, analysts noted the passage of CEPA, which "would add $4/share in value" to Exelon, was jeopardized because "[i]t is possible that an unfavorable outcome of the of the federal investigation" could "reduce or eliminate the chances of such legislation passing."

140.     The price of Exelon shares continued to decline from a high of $47.06 per share on October 15, 2019 to a close of $44.06 per share on October 17, 2019, eliminating approximately $2.9 billion in market capitalization even though the S&P 500 Index experienced an increase during the same period.

141.     On October 31, 2019, Exelon's directors and officers caused Exelon to disclose in its Quarterly 10-Q Report for the third quarter of 2019 ("3Q19 Report") that it had been notified of an SEC investigation into Exelon's and ComEd's lobbying activities as of October 22, 2019. The 3Q19 Report failed to disclose the scope of the investigations and refused to confirm

widespread speculation regarding the reasons for Pramaggiore's abrupt departure. As a result of the news, Exelon's share price fell $1.17 and closed approximately 3% below the opening price on October 31, 2019.

142.    Little to no concrete information about the SEC or USAO investigations were forthcoming until late February 2020, when WBEZ announced it had obtained nearly 1,200 pages of emails from Madigan's office directly implicating McClain and Pramaggiore in a bribery scheme. Throughout February and March of 2020, public reporting continued to connect the timing of ComEd's hires of Madigan's allies with the Company's many legislative victories. Numerous outlets speculated on how Exelon's newly established entanglement in the ongoing USAO corruption investigation would pose a risk to ComEd's ability to renegotiate its contracts with Chicago upon their expiration in December 2020.

143.    Exelon's share price fell precipitously during the next month. With unusually heavy trading volume, Exelon's share price opened at $35.54 on February 24, 2020, and had closed at $21.29 by March 23, 2020, hemorrhaging $14.25, or more than 40%, even though the overall S&P 100 Index declined by half as much during the same period. As a result, Exelon had lost an additional $10 billion of its market capitalization by the end of April 2020.

144.    The Individual Defendants repeatedly violated their applicable fiduciary duties by not disclosing the bribery scheme's impact on ComEd's revenue, its instrumental role in the passage of key legislation, the massive risks it necessarily imposed on Exelon, and the truth of the scope of the investigations.

F.    **THE COMPANY ADMITS FAULT IN THE DPA**

145.    In July 2020, ComEd and Exelon entered into a DPA with the USAO (the "government") in a case captioned *United States v. Commonwealth Edison Co*, 1:20-cr-00368.

41

146.    In the DPA, ComEd stipulated the truth and accuracy of the factual allegations set forth by the government. Namely, ComEd admitted that "its current and former officers, employees, and agents:

> [F]or the purpose of "assist[ing] ComEd with respect to legislation concerning ComEd and its business … arranged for various associates of [Madigan], including [Madigan]'s political allies and individuals who performed political work for [Madigan], to obtain jobs, vendor subcontracts, and monetary payments associated with these jobs and subtracts from ComEd, even in instances where certain political allies and works performed little or no work that they were purportedly hired to perform for ComEd."

147.    The DPA recognized the identified malfeasance involved the substantial participation of the CEO of ComEd, Pramaggiore, along with the knowledge, awareness, or participation of other "[c]ertain senior executives," and "third-party consultants and lobbyists," all of whom "were subject to Exelon's [Code]," which explicitly prohibited bribery and the use of third parties to make any other payment or offer "that could be improper."

148.    Therefore, because a significant number of individuals at ComEd participated in the bribery scheme for almost a decade—actions which blatantly contravened Exelon's Code—with the knowledge or awareness of numerous other senior officials and never faced any consequences, the DPA required ComEd and Exelon to engage in "significant remedial measure to enhance their compliance program," which included:

> [T]aking steps to ensure that employees and vendors ComEd identified as responsible for the conduct at issue are no longer employed by or have a relationship with ComEd; revamping the compliance structure including through the creation of the new position of Executive Vice President for Compliance and Audit with a direct reporting line to the Audit Committee of the Exelon Board of Directors and Chief Executive Officer; and drafting and implementing new compliance policies that, among other things: (a) require internal tracking and reporting of anything of value requested, solicited, or provided to public officials, including hiring requests; (b) establish due diligence and ongoing monitoring requirements for all third parties engaged in political consulting or lobbying activities; (c) prohibit subcontracting of third party lobbyists and political consultants; (d) mandate that the hiring of all third party lobbyists and political consultants must be approved by the Chief Compliance and Ethics Officer; and (e)

require ongoing monitoring of all third party lobbyists and political consultants to ensure they are providing value to the business.

149.    Notably, the DPA's compliance program required the implementation of significant reforms at Exelon providing for its increased oversight over ComEd's lobbying activities, thereby establishing that Exelon's directors, contrary to their fiduciary duties, had either failed to conduct meaningful oversight or had done so, discovered the bribery scheme, and then either participated in the same or failed to effectively stop it.

150.    The DPA further required ComEd to "develop and promulgate a clearly articulated and visible corporate policy against violations of U.S. law, which policy shall be memorialized in a written compliance code," implying that, prior to the DPA, ComEd either utterly lacked basic law-abiding requirements in its compliance policies or such terms were not binding or effective upon the individuals involved in the bribery scheme.

151.    Moreover, the DPA required ComEd to "ensure it has a system of financial and accounting procedures, including a system of internal controls, reasonably designed to ensure the maintenance of fair and accurate books, records, and accounts," suggesting it never had such policies in the first place.

152.    In agreeing to the DPA, ComEd acknowledged it had improperly reported its expenditures related to the bribery scheme were "for consulting and related services, when in truth, a substantial portion of the money paid to those vendors was intended for [Madigan]'s associates, who did little or no work for ComEd." ComEd and Exelon thus either had no meaningful internal accounting and audit procedures in place or those tasked with overseeing such audits were aware of the bribery scheme and did nothing.

153.    It appears that no senior official was ever tasked with oversight of ComEd's accounting and auditing programs, as the DPA instructed both ComEd and Exelon to assign at

least one or more of their senior executives with the implementation of a compliance system for ComEd, including bestowing such executive(s) with authority to report directly to independent monitoring bodies and the Boards of both ComEd and Exelon.

154.    Further damaging the Company financially and reputationally, the DPA required ComEd to annually report its progress in implementing these reforms in writing to the USAO for three years and required Exelon, on behalf of ComEd, to pay a criminal penalty of $200 million. The penalty was calculated by estimating the value of the improper legislative benefits the Company illegally reaped from the bribery scheme as exceeding $150 million.

**G.    EXELON'S OWN NON-PUBLIC INTERNAL BOOKS AND RECORDS SHOW** ██████████████████████████████████████████

155.    Based on the Company's admissions in the DPA, certain of the Plaintiffs made pre-suit books and records inspection demands to Exelon's Board pursuant to Section 1508. In response, pursuant to confidentiality agreements, the Company produced ███████████ ████████████████[2] ███████████████████████████

156.    ████████████████████████████████████

_____

[2]    The documents received pursuant to Plaintiffs' books and records inspection demands were produced bearings Bates EXE_GRUNZE_XXXXXX, for example, in reference to the Plaintiff's respective surname. For ease of reference, they are cited herein by EXE_XXXXXX.



157.

158.

159.



160.

161.

162.

46

163.  ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████

164. Further evidence of the Exelon Board's breach of its fiduciary duties stem from Pramaggiore's efforts, which spanned nearly a year, to install Ochoa on the ComEd Board, even though the ComEd Board was wholly under Exelon's control.

165. Specifically, according to the DPA, Pramaggiore was instructed by Madigan, through McClain, to begin her efforts in this regard in May 2018 and was met with "internal company opposition." In September 2019, Pramaggiore related to McClain that she was continuing her advocacy. Pramaggiore successfully had Ochoa appointed to the ComEd Board in April 2019, as revealed in a ComEd Proxy Statement filed with the SEC on April 26, 2019 (the "2019 ComEd Proxy").

166. The 2019 ComEd Proxy states that ComEd does not have a separate nominating committee and "those functions are fulfilled by the Corporate Governance Committee of the [Exelon Board]." It further provides that "[a]ll directors are being elected because they have been previously elected or appointed by the [Exelon Board] on the recommendation of the Corporate Governance Committee of Exelon."

167.  ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████



## H.     THE COMED FOUR ARE FOUND GUILTY OF BRIBERY

168.    ComEd's and Exelon's public reputations continued to suffer even after entry into the DPA, as the USAO's corruption investigations eventually led to high-profile criminal indictments of known ComEd lobbyists and executives and eventually, Madigan himself.

169.    First, on September 29, 2020, Marquez pled guilty to a corruption charge, attesting that during his time as a senior ComEd executive, he and other senior officials helped ComEd send approximately $1.3 million in bribes to Madigan's associates in exchange for Madigan's support on key legislation.

170.    Shortly thereafter, on November 18, 2020, a federal grand jury indicted the ComEd Four—Pramaggiore, Hooker, McClain, and Doherty—for various counts of bribery, public corruption, conspiracy, and willful falsifications of ComEd's books and records. The ComEd Four were found guilty by a jury. Although they have not been sentenced yet, each could receive up to twenty years in prison.

171.    In early January 2021, as pressure mounted, Madigan gave up the Speaker's gavel; the next month, Madigan resigned not only from the Illinois House seat he had held for 50 years, but also as head of the Illinois Democratic Party.

172.    On February 17, 2022, Judge Harry D. Leinenweber ("Judge Leinenweber") denied motions brought by the ComEd Four to dismiss the public corruption charges levied

against them. Judge Leinenweber, using "common sense," found that there was "sufficient information in the indictment to show that the [ComEd Four]'s actions" could constitute public corruption because the USAO "has alleged that the four Defendants offered, or intended to offer, financial incentives as a bribe to a public official to influence state laws governing the public corporation that employed." Further, Judge Leinenweber rejected the ComEd Four's argument that their actions fell within an exception—namely, that public corruption did not constitute "bona fide salary, wages, fees, or other compensation paid, or expenses reimbursed, in the usual course of business"—in concluding that "[t]he fact that these incentives were laundered partially through jobs does not invalidate the indictment. A company cannot use its payroll line on its accounting ledger to circumvent all Government oversight of public corruption."

173.    On March 3, 2022, Madigan and McClain were indicted on 22 separate charges, including federal racketeering, wire fraud, and bribery. On October 14, 2022, the USAO added additional counts for a conspiracy involving another company, which had already entered its own DPA and agreed to pay $23 million in fines. Both pled not guilty and are set for trial in April 2024; if convicted, each could be sentenced to up to twenty years in prison.

174.    On May 20, 2022, an application and affidavit for an FBI search warrant seeking McClain's cellular phone data was unsealed. Among other things, the affidavit detailed a May 2018 call from McClain to Pramaggiore regarding their scheme to defeat an energy bill supported by Madigan's daughter Lisa Madigan, the then-Illinois Attorney General. McClain stated: "We got, we've gotta kill it. Period.... And the problem is, any day now, the budget's gonna suck all the oxygen out of the building.... And the members won't be paying any attention to our lobbyists … and Lisa Madigan's gonna walk in and say, 'This is my legacy legislation, please vote for me.'" Pramaggiore dutifully responded: "Yep. Yep, no, I could not believe when I heard this

morning that we weren't doing that .... I'm gonna call [redacted] and I'm gonna say, '[redacted], if this bill passes, you're probably gonna have to fight for your life here at ComEd cause I'm out ....." The affidavit further demonstrated that there was a direct line of communication running through McClain from Madigan to Pramaggiore regarding the illicit appointment of Madigan's associate, Ochoa, to the ComEd Board. Indeed, after having a call with Madigan, McClain called Pramaggiore and advised that Madigan wanted her to continue pushing for Ochoa's appointment to the ComEd Board. Pramaggiore responded: "Okay. Got it. I will keep pressing."

175.    The ComEd Four went to trial on March 13, 2023 in a highly publicized proceeding lasting over two months. During opening statements, the USAO revealed that it possessed more than 100 recordings of various executives and lobbyists' active participation in the bribery scheme. Moreover, the USAO had evidence showing the ComEd Four acted to personally benefit themselves. For example, Pramaggiore's promotion to CEO of ComEd happened after she had Madigan muster enough votes to override the veto of EIMA in 2011.

176.    On March 22, 2023, O'Neill testified he faced "relentless" pressure by the "pest," McClain, to direct legal work to Reyes Kurson, Madigan's hand-picked law firm. When O'Neill sought to rescind Reyes Kurson's contract, McClain went over O'Neill's head to Pramaggiore, who personally ensured the contract was renewed. O'Neill also testified that he found it odd how, immediately prior to the passage of the FEJA, Madigan personally sent him dozens of emails about how much work Reyes Kurson received. O'Neill also peppered his lengthy testimony with how, throughout the many times McClain pressured him to find legal work for various friends of Madigan, O'Neill understood his cooperation was important to Madigan and the Company.

177.    Beginning March 27, 2023, Marquez took the stand for a week of testimony. He specified that he worked with McClain to set aside a certain number of internships and jobs at

ComEd on an annual basis specifically for Madigan's candidates, even waiving qualifications or creating jobs without work requirements where necessary. Marquez stated that he also helped convince O'Neill to renew Reyes Kurson's contract, pushed others to drum up more billable hours for the firm, and knew the contract was important to Madigan. Marquez verified that, prior to FEJA's passage, McClain sent him an email requesting $450,000, up from $250,000 in previous years, in political contributions. Notably, Marquez admitted there was no policy at the Company prohibiting the consideration of job recommendations from politicians and, further, nobody at ComEd, including O'Neill, suggested there was anything dubious about communicating regularly with Madigan.

178.    During Marquez's testimony, the government played his secret recordings of the ComEd Four for the jurors. During one conversation, Marquez asked Doherty what his subcontractors were doing, and Doherty replied, "not much." When Marquez told Pramaggiore the subcontractors just "collect a check," she did not seem worried or surprised, but told Marquez to ensure the arrangement was not disturbed until after the Illinois legislative session concluded. When Marquez asked McClain and Hooker how they thought "our friend" would react to the end of the subcontractor arrangement, Hooker responded: "You're not going to do something for me, I don't have to do anything for you." Marquez also verified a recording of McClain explaining to Dominguez, Pramaggiore's successor as CEO of ComEd, how the subcontractor arrangement was part of a strategy to make hires at the behest of public officials.

179.    On April 11, 2023, Moody took the stand to testify how he received checks starting in 2012 from ComEd to do "little or no work" because, as he understood it, the payments were *only* to compensate him for being a political operative for Madigan. Indeed, McClain told Moody the contract was "a hell of a plum" and he owed "the Speaker big." In 2014, Moody was

contracted by Doherty instead of ComEd, who paid him $4,500 a month. Doherty, however, never sent Moody any assignments. Moody testified that this arrangement continued until 2016, when Moody received permission from Madigan to seek political appointment. Upon successfully doing so, Moody's contract was removed from ComEd and Doherty and placed with other political allies of Madigan, who continued paying Moody for not doing any work.

180.    On April 17, 2023, Pramaggiore took the stand in her own defense for three days. Pramaggiore verified some of Marquez's recordings and admitted that she ultimately told him to inform her successor, Dominguez, about the make work arrangements. Pramaggiore also conceded she knew about Doherty's contracts and never took any steps to follow up or investigate because she did not think there was anything nefarious about them. Importantly, in denying knowledge of the arrangement's impropriety, Pramaggiore effectively admitted that no other person exercised reasonable oversight over the bribery scheme or tried to meaningfully stop it. Pramaggiore confessed she knew the importance of avoiding the appearance of impropriety because while she stated that she refused McClain's request to have ComEd ask its employees to volunteer for political campaigns, she paradoxically attested she had no such concerns when directly hiring employees and interns at the behest of Madigan. Pramaggiore also confirmed she never reported any concerns to O'Neill, as general counsel, because she did not think paying people for seven years without them doing any work posed an ethics problem.

181.    On April 22, 2023, the trial concluded with closing arguments and the jury began deliberations. The government detailed how, at the behest of Madigan, and at times immediately prior to the passage of favorable legislation, ComEd paid $1.3 million to ghost subcontractors that performed little to no work, paid $1.8 million to Reyes Kurson, annually hired up to ten interns from Madigan's ward, and appointed Ochoa to the ComEd Board despite internal

pushback. Closing arguments for the ComEd Four largely argued that these arrangements were just "how the sausage was made" in Illinois politics.

182.    Late in the evening of May 2, 2023, after a grueling 27 hours of deliberations, the jury found each of the ComEd Four guilty on every count. One juror told the media they convicted the ComEd Four because "we are tired of political corruption in general, and you know, we are hoping that this is a first step so that Illinois can function better." The juror called the verdict "a landmark where we start to do better four ourselves, for our children, and have pride in our city and our state and not make any shady deals to get things done because we don't need to." USAO prosecutors credited their victory to the hundreds of hours of clandestine recordings they gathered with the help of Marquez. No date for sentencing has been set, but Pramaggiore's counsel has publicly stated she intends to appeal the verdict. The news of the guilty verdict dominated the Chicago news cycle throughout the evening of May 3 and into the morning of May 4, 2023.

183.    Moreover, the trial itself dominated news coverage in Chicago throughout most of Illinois for over a month, further damaging the Company's public reputation with details of the brazenness and complexity of the bribery scheme and the complicitly or willful ignorance of top Exelon and ComEd executives.

184.    This coverage of the criminal conviction of the ComEd Four has significantly impaired the Company's prospective lobbying efforts. Namely, in the future, Illinois politicians will be more likely to go out of their way to avoid censure from constituents who would be upset to see their elected officials repeating Madigan's crimes by favoring the Company in any way. For years to come, the Company will be further damaged as its legitimate legislative concerns go unaddressed. The damage this neglect will cause Exelon is all the more acute because of the highly regulated nature of Exelon's business as a utility company.

185. Further, Madigan and McClain are set for trial on their particularly sensational racketeering charges in April 2024, which ensures that the sordid details of the Company's involvement in the corruption of Illinois politics will continue to be in the public eye.

## I. THE SECURITIES CLASS ACTION AND THE ICC INVESTIGATION

186. The Securities Class Action was filed on December 16, 2019, alleging that Exelon, ComEd, Pramaggiore, Crane, Von Hoene, and Dominguez fraudulently concealed the Company's participation in the alleged bribery scheme.

187. On April 21, 2021, the Northern District of Illinois declined to dismiss the operative Securities Class Action complaint, holding:

> [The Plaintiff] plead sufficiently as to scienter and his Complaint is replete with specific allegations that give rise to an inference that is replete with specific allegations that give rise to an inference that each [Securities Class Action] Defendant acted with the required state of mind. Plaintiffs pled motive, including that the bribery scheme was worth millions of dollars to the Company and each individual Defendant stood to gain from the scheme.

*Flynn v. Exelon Corp.*, 2021 U.S. Dist. LEXIS 76257, at *32 (N.D. Ill. Apr. 21, 2021). This ruling ensured that the litigation would continue, exposing the Company to further legal fees and costs. Moreover, the fact that a neutral third party substantiated how the allegations, if true, would support a conclusion Exelon and ComEd executives knowingly committed securities fraud has further degraded stockholders' confidence.

188. On January 28, 2022, a motion to certify an interlocutory appeal from the Court's denial of the motion to dismiss was denied in the Securities Class Action. When refusing to certify the appeal, the Court wrote the request did not meet the "contestable" standard because "Defendants have not offered any argument to indicate that this Court's earlier ruling would be reversed—let alone an argument as to the likelihood of such an event." This failure to certify an interlocutory appeal represented further damage to the Company, as the Securities Class Action

could proceed towards class certification and discovery.

189.    Shortly thereafter, on February 17, 2022, the Court denied motions brought by the ComEd Four in their criminal proceedings to dismiss the public corruption charges levied against them as further detailed above. Meanwhile, a federal grand jury indicted Madigan and McClain on racketeering and bribery charges on March 2, 2022.

190.    On August 12, 2021, the ICC initiated an investigation into the rate impacts of the conduct the Company admitted to in the DPA. The ICC eventually determined that ComEd may have impermissibly, in violation of the terms of the DPA, sought to "recover any portion of the fine through surcharges, fees or other changes to consumers." However, the ICC noted that the DPA allowed ComEd to pay the $200 million fine by accepting reimbursement or indemnification from Exelon. Thus, Exelon's choice to infuse ComEd with $200 million in equity funds for the payment of the criminal penalty further damaged Exelon financially, while the ICC investigation further damaged both it and ComEd reputationally.

191.    On August 17, 2022, the ICC issued its final order accepting ComEd's voluntary refund of approximately $38 million of customer funds Exelon used for DPA-related activities, further damaging the Company.

192.    On May 3, 2023, Exelon's CFO issued a public statement indicating that the Company expected to take a $173 million loss related to the Securities Class Action, but that "such loss would be fully covered by insurance."

## DERIVATIVE AND DEMAND ALLEGATIONS

193.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

194.    Plaintiffs bring this action derivatively in the right and for the benefit of Exelon to redress injuries suffered, and to be suffered, by Exelon as a direct result of Defendants'

breaches of fiduciary duty and other violations of Illinois and federal law.

195.    Plaintiffs were shareholders of Exelon common stock at the time of the wrongdoing alleged herein and have been shareholders of Exelon common stock continuously since that time.

196.    Plaintiffs will adequately and fairly represent the interests of Exelon and its shareholders in enforcing and prosecuting its rights.

197.    In compliance with Pennsylvania law, on March 20, 2020, January 5, 2022, and May 3, 2022, respectively, each of Plaintiffs Dybas, Grunze, and Wax made a formal demand to the Exelon Board to undertake a completely independent internal investigation in good faith into the violations of state and federal law detailed herein (the "Litigation Demands"). Further, Plaintiffs each demanded the Exelon Board take appropriate disciplinary action, commence a civil action against those who harmed the Company, and implement various corporate reforms to optimize internal governance with current relevant best practices and prevent recurrences of the Exelon Board's repeated oversight failures which enabled the bribery scheme.

198.    In response, the Exelon Board referred Plaintiffs' Litigation Demands to a special litigation committee ("SLC").

199.    According to the Production, ███████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████



200.

201.

## COUNT I

### Breach of Fiduciary Duty
### (Derivatively Against the Individual Defendants)

202.  Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

203.  The Individual Defendants owed and/or presently owe Exelon fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and/or presently owe Exelon the highest obligation of loyalty, good faith, due care, oversight, reasonable inquiry, supervision, fair dealing, and candor.

204.  Each of the Individual Defendants violated and breached their fiduciary duties of loyalty, good faith, due care, oversight, reasonable inquiry, supervision, fair dealing, and candor.

205.  Each of the Individual Defendants had actual or constructive knowledge which caused them to violate their fiduciary duty to the Company. Namely, each knowingly or intentionally allowed the Company to make false and misleading statements to the public and/or allowed such statements to be made in conscious disregard of each statement's truth or falsity. As a result, the Individual Defendants caused the Company's SEC filings and other public statements to be materially false and misleading at all relevant times. Further, the Individual Defendants failed to correct the false and misleading and/or omissions of material fact thereafter.

206.  In addition, the Individual Defendants also failed to supervise, exert internal controls over, and/or consciously disregarded responsibilities involving the Company, including, but not limited to, the prevention of illegal conduct and internal compliance with the Code.

207.  Moreover, the Individual Defendants also participated in, facilitated, authorized, directly benefited from, or aided and abetted the illegal conduct alleged herein.

208.  Such actions were not a good faith exercise of prudent business judgment and

thereby failed to protect and promote Exelon's interests.

209.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Exelon has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company

210.    Plaintiffs, on behalf of Exelon, have no adequate remedy at law.

### COUNT II

#### Violation of § 14(a) of the Exchange Act
#### (Derivatively Against Defendants Anderson, Berzin, Brlas, Crane, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Shattuck, Steinour, and Young)

211.    Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

212.    This claim is brought derivatively on Exelon's behalf for certain of the Individual Defendants' violations of Section 14(a) of the Exchange Act and Rule14a-9 promulgated thereunder.

213.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

214.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false

or misleading." 17 C.F.R. §240.14a-9.

215.    The 2019 Proxy Statement was solicited "on behalf of the Board of Directors" (then comprising Defendants Anderson, Berzin, Brlas, Crane, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Shattuck, Steinour, and Young), and sought the re-election of same.

216.    The 2019 Proxy Statement stated that Exelon's Risk Committee oversaw the Company's internal audit function, met regularly to ensure processes are and were in place to identify and assess risk exposures, and monitored internal compliance with Exelon's Code of Business Conduct. Further, it claimed the Exelon Board regularly reviewed management's risk assessment procedures at subsidiaries such as ComEd.

217.    The 2019 Proxy Statement was false and misleading and omitted material information because the Individual Defendants had consciously disregarded the Exelon Board's oversight responsibilities with respect to the accuracy of internal audits, as later revealed by the criminal conviction of the ComEd Four for falsification of books and records. Further, the Individual Defendants had also consciously disregarded responsibilities for monitoring internal compliance with the Code and the law, both of which prohibited the Individual Defendants from engaging in the illegal bribery scheme or otherwise aiding and abetting the same. As described in the DPA and elsewhere above, the Individual Defendants' lack of oversight and failure to implement internal controls actively facilitated the illegal behavior described herein. As direct and proximate result, the 2019 Proxy contained misleading statements that concealed the breaches of fiduciary duty alleged herein, as well as the fact of the bribery scheme itself.

218.    Further, the 2019 Proxy misrepresented or failed to disclose material deficiencies and lack of effective oversight in Exelon's risk management and internal controls that were known to or consciously disregarded by the Individual Defendants when it was filed.

219.   The misrepresentations and omissions in the 2019 Proxy were material to Company shareholders in voting on the 2019 Proxy, the reelection of certain Individual Defendants, and the approval of the proposed executive compensation.

220.   Exelon was damaged as a result of Defendants Anderson, Berzin, Brlas, Crane, de Balmann, DeBenedictis, Jojo, Joskow, Lawless, Mies, Shattuck, Steinour, and Young's material misrepresentations and omissions in the 2019 Proxy.

221.   Plaintiffs, on behalf of Exelon, have no adequate remedy at law.

## COUNT III

### Corporate Waste
### (Derivatively Against the Individual Defendants)

222.   Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

223.   The Individual Defendants caused, approved, or failed to prevent Exelon from paying costs associated with the bribery scheme, including, but not limited to, the $200 million in criminal penalties assessed on ComEd.

224.   As a result, the Company was caused to waste its assets.

225.   The exchange of the Company's assets for no benefit to Exelon, accordingly, was so one-sided no person of ordinary, sound business judgment could conclude Exelon received adequate consideration.

226.   The Individual Defendants are liable to the Company for the amount of corporate assets thus wasted by them.

227.   Plaintiffs, on behalf of Exelon, have no adequate remedy at law.

## COUNT IV

### Unjust Enrichment
### (Derivatively Against the Individual Defendants)

228.     Plaintiffs incorporate by reference all preceding and subsequent paragraphs as if fully set forth herein.

229.     Each Individual Defendant benefitted from the wrongful conduct alleged herein by receiving bonuses, stock options, or other compensation from Exelon.

230.     Such benefits were tied to each Individual Defendant's performance.

231.     Such benefits and compensation were thereby unjust in light of the Individual Defendants' wrongful conduct.

232.     Under these circumstances, it would be unconscionable for the Individual Defendants to retain the benefits they improperly received.

233.     Plaintiffs, on behalf of Exelon, have no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.     Declaring Plaintiffs may maintain this derivative action on behalf of Exelon and Plaintiffs are proper and adequate representatives of the Company;

B.     Awarding Exelon money damages against the Individual Defendants for all losses and damages sustained by Exelon and its shareholders as a result of Defendants' wrongful acts;

C.     Directing Exelon to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and best practices and, further, to protect Exelon and its stockholders from a repeat of the damaging events described herein;

D.     Ordering Defendants to disgorge all profits, benefits, and other compensation unlawfully obtained from Exelon pursuant to Defendants' wrongful acts as alleged herein;

E.  Imposing any equitable or injunctive relief as required to effectuate the relief requested herein;

F.  Awarding Exelon pre-judgment interest and post-judgment interest as allowed by law;

G.  Awarding to each Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

H.  Granting such other and further relief as the Court deems just and proper.

Dated: May 25, 2023

**HEFFNER HURST**

By: */s/ Matthew T. Heffner*
Matthew T. Heffner
*mheffner@heffnerhurst.com*
30 North LaSalle, Suite 1210
Chicago, Illinois 60602
Telephone: (312) 346-3466
Facsimile: (312) 346-2829

*Local Counsel for Plaintiffs*

**KAHN SWICK & FOTI, LLC**
Melinda A. Nicholson (*pro hac vice* application to be filed)
*melinda.nicholson@ksfcounsel.com*
Nicolas Kravitz
*nicolas.kravitz@ksfcounsel.com*
1100 Poydras Street, Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Fax: (504) 455-1498

*Counsel for Plaintiff William Grunze*

**THE WEISER LAW FIRM, P.C.**
James Ficaro (*pro hac vice* application to be filed)
*jficaro@weiserlawfirm.com*
200 Barr Harbor Drive, Suite 400
West Conshohocken, PA 19428
Telephone: (610) 225-0206

63

*Counsel for Plaintiff Michael Dybas*

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn (*pro hac vice* application to be filed)
*rusty@shumanlawfirm.com*
600 17th Street, Suite 2800 South
Denver, CO 80202
Telephone: (303) 861-3003
Fax: (303) 536-7849

-and-

Brett D. Stecker (*pro hac vice* application to be filed)
*brett@shumanlawfirm.com*
326 W. Lancaster Avenue
Ardmore, PA 19003
Telephone: (303) 861-3003
Fax: (303) 536-7849

**POMERANTZ LLP**
Gustavo F. Bruckner (*pro hac vice* application to be filed)
*gfbruckner@pomlaw.com*
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Fax: (917) 463-1044

*Counsel for Plaintiff Benjamin Jason Wax*

**POMERANTZ LLP**

Patrick V. Dahlstrom
*pdahlstrom@pomlaw.com*
10 South LaSalle Street, Suite 3505
Chicago, IL 60603
Telephone: (312) 377-1181
Fax: (312) 229-8811

*Additional Counsel for Plaintiff Benjamin Jason Wax*

## VERIFICATION

I, Michael Dybas, hereby verify that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") in the within action captioned *Dybas, et al. v. Crane, et. al.*, N.D. Ill., and I authorize its filing. I have reviewed the allegations made in the Complaint, and regarding those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason I believe them to be true. I further declare that I am a current owner of Exelon Corporation common stock, have been an owner of the same from at least 2014 to the present, and am ready, willing, and able to pursue this action in the hopes of improving the Company and recovering damages for it caused by Defendants' conduct.

5/15/2023

Date: _____

DocuSigned by:

*Michael Dybas*

302C5539D3D6402...

_____

Michael Dybas

DocuSign Envelope ID: B1386685-7DEE-440E-8236-7593289F7F46

## VERIFICATION

I, William Grunze, hereby verify that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") in the within action captioned *Dybas, et al. v. Crane, et. al.*, N.D. Ill., and I authorize its filing. I have reviewed the allegations made in the Complaint, and regarding those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason I believe them to be true. I further declare that I am a current owner of Exelon Corporation common stock, have been an owner of the same from at least 2011 to the present, and am ready, willing, and able to pursue this action in the hopes of improving the Company and recovering damages for it caused by Defendants' conduct.

Date: _____
5/13/2023

DocuSigned by:

890BDC6F162A4B1...

William Grunze

## VERIFICATION

I, Benjamin Jason Wax, hereby verify that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") in the within action captioned *Dybas, et al. v. Crane, et. al.*, N.D. Ill., and I authorize its filing. I have reviewed the allegations made in the Complaint, and regarding those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason I believe them to be true. I further declare that I am a current owner of Exelon Corporation common stock, have been an owner of the same from at least 2002 to the present, and am ready, willing, and able to pursue this action in the hopes of improving the Company and recovering damages for it caused by Defendants' conduct.

Date: 5/13/2023

Benjamin Jason Wax